1    Adam M. Apton (State Bar No. 316516)
     Email: aapton@zlk.com
2    **LEVI & KORSINSKY, LLP**
     1160 Battery Street East, Suite 100 - #3425
3    San Francisco, CA 94111
     Telephone: (415) 373-1671
4    Facsimile: (212) 363-7171

5    Counsel for Plaintiff Michael O'Neill

6
     *[Additional Counsel on Signature Page]*
7
                    **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**

9

10   MICHAEL O'NEILL, Derivatively on Behalf
     of BLOCK, INC.,                              Case No. 5:25-cv-8682
11                   Plaintiff,
            v.
12                                                **VERIFIED STOCKHOLDER**
                                                  **DERIVATIVE COMPLAINT**
13   JACK DORSEY, AMRITA AHUJA,
     ROELOF BOTHA, AMY BROOKS,
14   SHAWN CARTER, PAUL DEIGHTON,
     RANDALL GARUTTI, JAMES
15   MCKELVEY, MARY MEEKER, ANNA                  **JURY TRIAL DEMANDED**
     PATTERSON, SHARON ROTHSTEIN,
16   LAWRENCE SUMMERS, DAVID VINIAR,
     and DARREN WALKER,
17                   Individual Defendants,

18
             -and-
19
     BLOCK, INC.,
20                   Nominal Defendant.

21

22          Plaintiff Michael O'Neill ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal

23   Defendant Block, Inc. ("**Block**" or the "**Company**"), submits this Verified Stockholder Derivative

24   Complaint against Individual Defendants Jack Dorsey, Amrita Ahuja, Roelof Botha, Amy Brooks,

25   Shawn Carter, Paul Deighton, Randall Garutti, James McKelvey, Mary Meeker, Anna Patterson,

26   Sharon Rothstein, Lawrence Summers, David Viniar, and Darren Walker (collectively, the

27   "**Individual Defendants**") for breaches of fiduciary duties as directors and/or officers of Block,

unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff's allegations are based on his personal knowledge as to himself and his own acts and upon information and belief as to all other matters, the basis of which includes, *inter alia*, the investigation of Plaintiff's counsel and their review and analysis of the Company's public filings with the U.S. Securities & Exchange Commission ("**SEC**"), news reports, press releases, and other publicly available sources, as well as the review and analysis of books and records produced by the Company in response to Plaintiff's demand made pursuant to 8 *Del. C.* § 220 ("**Section 220**"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Block against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein caused substantial damage to Block's reputation, goodwill, and standing in the business community and exposed it to substantial liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein damaged Block in the form of, among other things, millions of dollars in losses to the Company's market capitalization. Accordingly, Plaintiff seeks to remedy wrongdoing committed by Block's directors and officers from at least February 2019, through the present (the "**Relevant Period**").

2.     Block, formerly Square, Inc., was co-founded by Jack Dorsey ("**Dorsey**") and James McKelvey ("**McKelvey**") in February 2009. In 2013, the Company launched Cash App, which offers a wide range of financial services to people over 13 years of age, including allowing users to transfer money in or out of the app, make purchases using a prepaid debit card linked to the user's account, invest in stocks or bitcoin, and even apply for personal loans.

3.     Block built Cash App on a "frictionless onboarding" model, which intentionally requires minimal information to sign up new customers. To create an account, users simply

download the app and enter a phone number or email address along with a zip code. No unique identifying details, such as bank account information or a Social Security number, are needed.

4.    This approach promotes accessibility and rapid adoption but carries substantial risks, including vulnerability to fraudulent account creation. Malicious actors can easily generate multiple fake or duplicate accounts using minimal data, enabling synthetic identity fraud, account takeovers, scams, unauthorized transactions, and exploitation of services like loans and transfers. It can also facilitate money laundering, sanctions evasion, narcotics distribution, human trafficking, and other illicit activities by unverified users.

5.    In the financial services industry, frictionless onboarding often leads to higher fraud rates, manual reviews, disputes, chargebacks, support queries, operational costs, and inefficiencies from unresolved alerts or backlogs. It may artificially inflate user metrics through redundant or counterfeit accounts, distorting internal analytics and misleading investors who rely on accurate engagement and growth data. In FinTech, such inflation is linked to compliance lapses and reputational harm when discrepancies emerge.

6.    Financial institutions like Block are subject to stringent regulations, including Know Your Customer ("**KYC**") and Anti-Money Laundering ("**AML**") mandates, which require thorough customer due diligence. A frictionless model may violate these by failing to collect sufficient identifying information, exposing the organization to legal penalties, audits, and enforcement actions.

7.    While complementary measures—such as advanced fraud detection tools, biometric verification, adaptive risk scoring, and robust monitoring—could mitigate these vulnerabilities, Block failed to implement them. Instead, the Company prioritized aggressive user growth, leveraging the simplified registration to expand Cash App's monthly active users from 17.6 million in 2019 to over 53.1 million by 2023. This not only accelerated account creation, regardless of whether accounts represented distinct individuals, but also enabled fraudulent and unlawful behaviors.

8.      The Individual Defendants chose not to institute proper oversight or address risks, even though they knew unauthorized activities from streamlined registration were rampant. Upon detecting fraud or restricted conduct, the Company might only restrict or suspend the specific account, without permanently barring the user or investigating linked suspicious profiles. They also failed to scale compliance infrastructure as account volumes surged, delaying efforts, delegating functions externally, relaxing standards for expansion, and relying on automated systems instead of resourcing compliance adequately.

9.      Documents from Plaintiff's Section 220 investigation show the Board received multiple "red flags" over an extended period about insufficient oversight and the detrimental effects of frictionless onboarding but took no remedial steps to align with legal standards. The Board and its Audit and Risk Committee ("**ARC**") recognized ongoing failures to verify user identities per regulations, address grievances, identify and mitigate fraudulent or criminal actions, reimburse affected users, or provide sufficient support. As a result, misconduct and misuse escalated, often leaving users without remedies. Reports indicated that 40% to 75% of Cash App profiles were counterfeit, linked to fraud, or redundant accounts tied to the same person.

10.      Block's inadequate oversight begin to come to light on March 23, 2023, with the release of a *Hindenburg Research* report entitled "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion" (the "**Hindenburg Report**").[1] The report was the product of a comprehensive two-year inquiry involving interviews with ex-employees, collaborators, and specialists, alongside examinations of regulatory documents and public records. It explains how the Company exaggerated its authentic user figures while allowing misconduct and illegal operations to thrive on Cash App. According to the Hindenburg Report, former employees disclosed that Block lacked effective mechanisms to verify user identities, which contributed to substantial compliance deficiencies primarily stemming from its frictionless onboarding procedures.

---

[1] *See* Hindenburg Report, https://hindenburgresearch.com/block/.

11.     Approximately one year later, also citing allegations from former Block employees, additional reports disclosed that the Company suffered from widespread compliance lapses and had no effective procedures to establish the identity of its customers. As *NBC News* reported on February 16, 2024, two whistleblowers filed complaints with the U.S. Department of Treasury's Financial Crimes Enforcement Network ("**FinCEN**") alleging that the Company "had no effective procedure to establish the identity of its [Cash App] customers."[2]

12.     On May 1, 2024, *NBC News* further reported that federal prosecutors were digging into former employees' allegations of "widespread and yearslong compliance lapses" at the Company, which were seemingly known to Block's leadership and the Board.[3]

13.     On January 16, 2025, the Consumer Financial Protection Bureau ("**CFPB**") released an enforcement directive targeting Block, determining that the Company, in violation of the Consumer Financial Protection Act of 2010 ("**CFPA**"): (i) did not deliver sufficient support services to customers; (ii) neglected to implement suitable actions to curb fraud on Cash App; (iii) failed to promptly examine and settle disputes over unapproved transfers; and (iv) omitted additional necessary measures for fraud and error handling for users.

14.     On April 10, 2025, the New York Department of Financial Services ("**NYDFS**") disclosed the details of its enforcement directive and imposed penalties on Block. This directive highlighted major shortcomings in Block's financial oversight, including user verification practices, transaction surveillance, and how suspicious activities were reported from 2018 to at least 2021. In relation to this directive, NYDFS Superintendent Adrienne A. Harris remarked that the swift expansion of Block's Cash App without strong adherence mechanisms generated risks and weaknesses that contravened regulations.

---

[2] Gretchen Morgenson, *Federal regulators are probing whether Cash App leaves door open to money launderers, terrorist*, NBC NEWS (Feb. 16, 2024), https://www.nbcnews.com/business/personal-finance/whistleblowers-cash-app-leaves-door-open-money-laundering-terror-rcna138958.

[3] Gretchen Morgenson, *Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square*, NBC NEWS (May 1, 2024), https://www.nbcnews.com/business/personal-finance/prosecutors-examining-transactions-block-owner-cash-app-square-rcna147181.

15.    The Individual Defendants provided deceptive information to the Company and Block's investors. Annual shareholder communications claimed the Board dutifully engaged in risk oversight but failed to mention the recurring deficiencies that triggered governmental probes resulting in substantial financial penalties. Additionally, the Individual Defendants falsely touted a commitment to establishing strong anti-misconduct frameworks. For instance, on February 24, 2022, Dorsey indicated that Block maintained restrictions to control fraud on Cash App and sought ways to enhance them. This was demonstrably false.

16.    By denuding compliance through frictionless onboarding to artificially boost user figures and profit, defendants damaged Block's reputation resulting in governmental inquiries, unfavorable enforcement measures, fines exceeding $295 million, and expensive litigation related to securities violations.

17.    Adding to the Board's inadequate supervision and adherence to risk systems, the directors overlooked the conduct of the Company's co-founders, Dorsey and McKelvey, who sold over $1 billion in Block shares at inflated valuations.

## II.    DEFENDANTS WRONGFULLY REFUSED PLAINTIFF'S LITIGATION DEMAND

18.    On June 25, 2025, Plaintiff sent the Board a demand (attached hereto as Exhibit A) (the "**Demand**"), requesting that the Board investigate and pursue remedies for breaches of fiduciary duties by current and former directors and officers. The Demand highlighted systemic compliance failures in the Cash App platform, including inadequate KYC protocols that facilitated fraud and illicit activities, misleading public statements regarding risk management, and insider stock sales by co-founders Dorsey and McKelvey exceeding $1 billion while they possessed material non-public information. The Demand referenced the CFPB's and the NYDFS's regulatory penalties totaling $295 million and securities litigation arising from these issues.

19.    The Demand, based on an extensive investigation, including a review of Block's public filings, news reports, regulatory actions, and corporate books and records obtained pursuant to Section 220, called for the formation of an independent special committee to conduct a thorough

inquiry, engage external experts, and initiate legal action to recover damages, disgorge improper gains, and implement governance reforms to prevent future misconduct.

20.    In response, Block's Chief Legal Officer, Chrysty Esperanza, sent a letter dated August 28, 2025 (attached hereto as Exhibit B) indicating that the Board considered the demand at its July 31, 2025, meeting and elected to defer any action pending the final resolution of a related securities class action captioned *Gonsalves v. Block, Inc.*, Case No. 5:25-cv-00642-NW (N.D. Cal.) (the "**Securities Class Action**") and other ongoing proceedings. The response asserted, absent meaningful explanation, that pursuing the demands would prejudice Block's defenses in those matters and offered tolling agreements with certain individuals to preserve potential claims.

21.    The denial of the Demand by Block's Board is feckless under the circumstances because it constitutes an ineffective and evasive maneuver that fails to fulfill the Board's fiduciary obligations and perpetuates ongoing harm to the Company. This deferral—conditioning any action on the resolution of the Securities Class Action (which alleges different claims) without a specified timeline or substantive engagement—amounts to a constructive wrongful refusal, particularly in light of the serious allegations of fiduciary breaches detailed herein.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Section 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

24.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who

has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

25.    Block maintains a forum provision in its Amended and Restated Bylaws, effective as of October 20, 2022. This clause is found in Article VII, Section 7.7.

26.    This provision designates the Delaware Court of Chancery (or, if it lacks jurisdiction, another Delaware state court or the U.S. District Court for the District of Delaware) as the exclusive forum for specified internal corporate matters, such as derivative actions, fiduciary duty breaches, claims under the Delaware General Corporation Law ("**DGCL**"), the Company's certificate of incorporation or bylaws, and internal affairs doctrine disputes. It also mandates U.S. federal district courts as the exclusive forum for claims under the Securities Act of 1933 (as amended), subject to the company's written consent for alternatives.

27.    The clause, however, explicitly carves out an exception for claims under the Exchange Act or its successors, stating that "nothing contained in this Section 7.7 shall apply" to such actions. This exclusion means the bylaws do not restrict the forum for Exchange Act claims to Delaware courts (state or federal). As a result, lawsuits asserting violations of the Exchange Act may be filed in U.S. District Court for the Northern District of California.

## IV.    THE PARTIES

### A.    Plaintiff

28.    Plaintiff is and has continuously been a stockholder of Block during the wrongdoing complained of herein. Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting his rights and has retained counsel experienced and competent in the prosecution of shareholder derivative litigation.

### B.    Nominal Defendant

29.    Nominal Defendant Block is a Delaware corporation with its principal executive offices located at 1955 Broadway, Suite 600, Oakland, California 94612. Block's common stock trades on the New York Stock Exchange ("**NYSE**") under the ticker symbol "SQ."

**C.      Officer Defendants**

30.      Defendant Dorsey is a co-founder of the Company, has served as principal executive officer and as a member of the Board of Directors since July 2009, and as Chairman of the Board since October 2010. Dorsey has also served as Chief Executive Officer ("**CEO**") and President from July 2009 until the title of CEO was changed to Block Head in April 2022. Dorsey has also served as Square Head since October 2023.

31.      Defendant Amrita Ahuja ("**Ahuja**") has served as the Company's Chief Operating Officer ("**COO**") since February 2023, and as its Chief Financial Officer ("**CFO**") since January 2019. As CFO, Ahuja was present for a portion of every Board and ARC meeting held during the Relevant Period.

32.      Together, Defendants Dorsey and Ahuja may be referred to herein as the "**Officer Defendants**."

**D.      Current Director Defendants**

33.      Defendant McKelvey is co-founder of the Company and has served on the Company's Board since July 2009.

34.      Defendant Roelof Botha ("**Botha**") has served as a member of the Company's Board since January 2011 and as Lead Independent Director since June 2022. Botha is currently a member of the ARC, a position he has held since 2016. He is also a member of the Compensation Committee.

35.      Defendant Amy Brooks ("**Brooks**") has served as a member of the Company's Board since October 2019. She has also served as a member of the Nominating and Corporate Governance Committee since October 2019.

36.      Defendant Shawn Carter ("**Carter**") has served as a member of the Company's Board since May 2021.

37.      Defendant Paul Deighton ("**Deighton**") has served as a member of the Company's Board since May 2016. Deighton is currently the chair of the ARC, a position he has held since June 2022. He has also served as a member of the Compensation Committee since July 2016.

38.     Defendant Randal Garutti ("**Garutti**") has served as a member of the Company's Board since 2017. Garutti is currently a member of the Compensation Committee and is Chair of the Nominating and Corporate Governance Committee.

39.     Defendant Mary Meeker ("**Meeker**") has served as a member of the Company's Board since 2011. Meeker is currently the Chair of the Compensation Committee.

40.     Together, Defendants Dorsey, McKelvey, Botha, Brooks, Carter, Deighton, Garutti, and Meeker may be referred to herein as the "**Current Director Defendants**."

**E.     Former Director Defendants**

41.     Defendant Anna Patterson ("**Patterson**") served as a member of the Company's Board from November 2017 until June 2022. Patterson was a member of the ARC from 2018 through 2022.

42.     Defendant Sharon Rothstein ("**Rothstein**") served as a member of the Company's Board from January 2022 until June 18, 2024. Rothstein was previously a member of the Compensation Committee.

43.     Defendant Lawrence Summers ("**Summers**") served as a member of the Company's Board of Directors from June 22, 2011, until February 8, 2024. Summers was a member of the ARC from 2016 through 2023.

44.     Defendant David Viniar ("**Viniar**") served as a member of the Company's Board from October 1, 2013, until June 2022. Viniar served as the Chair of the ARC from 2016 through 2022.

45.     Defendant Darren Walker ("**Walker**") served as a member of the Company's Board from June 16, 2020, until August 1, 2023. Walker attended several ARC meetings throughout 2022, becoming an official member of the ARC in 2023.

46.     Together, Defendants Patterson, Rothstein, Summers, Viniar, and Walker may be referred to herein as the "**Former Director Defendants**."  Collectively, the Former Director Defendants and the Current Director Defendants may be referred to herein as the "**Director Defendants**."

1    **F.    Relevant Non-Parties**

2    47.    Neha Narula ("**Narula**") has served as a member of the Company's Board since

3    July 2023. Narula is a member of the ARC, as well as the Nominating and Corporate Governance

4    Committee.

5    48.    Anthony Eisen ("**Eisen**") became a member of the Company's Board on February

6    6, 2025. Eisen is the co-founder of Afterpay Limited ("**Afterpay**"), an Australian technology

7    company that was acquired by Block on January 31, 2022.

8    49.    The Individual Defendants, because of their positions with Block, possessed the

9    power and authority to control the contents of Block's reports to the SEC, press releases, and

10    presentations to investors and analysts. Each of the Individual Defendants was provided with

11    copies of the Company's reports and press releases alleged herein to be misleading prior to or

12    shortly after their issuance, and each had the ability and opportunity to prevent their issuance or

13    cause them to be corrected. Because of their positions and access to the Company's confidential

14    information, each of the Individual Defendants knew that the adverse facts specified herein had

15    not been disclosed to and were being concealed from the public and that the positive

16    representations being made were then materially false and/or misleading.

17    **V.    SUBSTANTIVE ALLEGATIONS**

18    **A.    The Company's Operations**

19    **1.    Block's Implementation of "Frictionless" Onboarding Enables Cash**

20    **App to Surpass the Performance of Its Original Point-of-Sale System**

21    50.    Founded in 2009 by Dorsey and McKelvey, Block (formerly "**Square, Inc.**") is a

22    financial services and digital payment company that was initially focused on providing point of

23    sale systems for small and medium-sized businesses to accept card payments through its Square

24    payment processing system. Block now calls this merchant-facing side of its business the "Square

25    ecosystem."

26    51.    Block now offers mobile-first financial services for the social media era, operating

27    two primary "ecosystems": (i) Square, a seller-facing platform that provides point-of-sale

processing and business tools (inventory, CRM, payroll, lending, and banking); and (ii) Cash App, a consumer-facing financial application.

52.    Cash App offers a broad suite of retail financial functions, including stored balances, direct deposit of wages and government benefits, a Cash-App-issued Visa debit card, peer-to-peer transfers, bitcoin buying/selling, fractional equity investing, and tax-filing.

53.    During the Relevant Period, Cash App became the Company's largest profit contributor (*e.g.*, ~$5.24 billion in 2024 gross profit, ~59% of Block's total), underscoring that compliance for Cash App's core financial services is "mission critical."

54.    One of the main advantages Cash App purports to enjoy over competition is the low cost required to attain new users. As Dorsey explained during Block's Q2 2017 earnings call on August 2, 2017: "We're able to onboard individuals to [Cash App] with just a ZIP Code and an email address or phone number."[4] Dorsey claimed that Block was able to manage the risks that such low-information accounts posed, further stating, "[w]e've used machine learning and data science to manage risk since the beginning of Square. We're constantly looking for ways to make our services more automated and more self-serve, and machine learning is perfect for that."[5] Block's reliance on machine learning, including its compliance and risk management systems, proved detrimental to the Company.

55.    Block built Cash App on the bedrock of "frictionless onboarding," a process of intentionally seeking minimum information to sign up new customers. To create a Cash App account, a potential user only needs to download the app and enter either a phone number or an email address and a zip code. No unique identifying information—such as bank account information or a Social Security number—is required.

56.    During Block's Q3 2018 earnings call, Dorsey characterized Cash App's limited onboarding information as a "frictionless" approach, stating that the Company's "focus is really

---

[4] *See* Block's Q2 2017 Earnings Call Transcript (Aug. 2, 2017),
https://seekingalpha.com/article/4094029-square-sq-q2-2017-results-earnings-call-transcript.
[5] *Id.*

observing what our customers are doing and then taking as much friction out as possible, while adding some magic at the same time."[6]

57. "Frictionless" onboarding became a central pillar in Block's business plans. In 2019, Block touted the "frictionless onboarding" of Cash App users, whereby the Company sought as little information as possible from its new customers to focus on growth and acquisition of new customers at scale.

58. Block's valuation is highly dependent upon the steady increase of its user base. Block's fiduciaries thus were laser-focused on expanding the number of Cash App users, and Block's "frictionless" business model achieved this objective – the Company's reported Cash App monthly actives grew from 17.6M in 2019 to over 53.1M in 2023.

59. On March 27, 2020, federal legislation, the Coronavirus Aid, Relief, and Economic Security Act (known as the "**CARES Act**"), was signed into law, providing expanded unemployment insurance benefits to those affected by the COVID-19 pandemic.

60. In response, Block transitioned the Cash App platform into a distribution system for pandemic relief. One day before the CARES Act was signed into law, Dorsey tweeted, "the technology exists to get money to most people today (even to those without bank accounts) …. US government: let us help."[7]

61. Shortly thereafter, Cash App offered users the ability to receive COVID relief payments through its platform. Dorsey, through his Twitter (now "**X**") account, personally promoted Cash App as a tool where users could receive COVID-19 relief payments, "immediately," and with "no bank account needed."[8] Approximately 11 million people activated the direct deposit feature on their existing Cash App accounts, or set up new deposit-enabled

---

[6] *See* Block's Q3 2018 Earnings Call Transcript (Nov. 7, 2018), https://seekingalpha.com/article/4219655-square-inc-sq-ceo-jack-dorsey-on-q3-2018-results-earnings-call-transcript.

[7] Jeff Kauflin, *Fintech Says They Can Speed Up The Stimulus, If The Government Just Lets Them*, FORBES (Mar. 31, 2020), https://www.forbes.com/sites/jeffkauflin/2020/03/31/fintechs-say-they-can-speed-up-the-stimulus-if-the-government-just-lets-them/.

[8] *See* Hindenburg Report.

accounts within weeks of Dorsey's "tweet" helping Block increase its financial metrics throughout the pandemic.[9] These new transactions were an important pivot for Block, as COVID-19 posed an existential threat to Block's commercial business as demand for point-of-sale systems decreased sharply.

62.     Cash App became Block's most important product as the COVID-19 pandemic set in. By the end of 2020, Cash App's gross profit was $1.2 billion, and was poised to surpass the Company's merchant side business (*i.e.*, Square), which accounted for $1.5 billion in profits but was experiencing slowing growth from the previous year. The Company also reported 36 million monthly transacting active customers in December 2020. From this point forward, the Company's reported growth in Cash App monthly transacting users and gross profits would outpace those of its Square merchant side business.

### 2.     As a Financial Institution, Block is Subject to Various Record-Keeping and Reporting Requirements

63.     Block engages in money transmission and virtual currency activities through Cash App and its associated products, leading to its registration as a "Money Services Business" with FinCEN and subjecting it to federal and state financial crime compliance requirements.

64.     Among other things, FinCEN is responsible for enforcing compliance with the Bank Secrecy Act ("**BSA**"). Under the BSA, financial institutions, such as Block, are required to assist U.S. government agencies in detecting and preventing money laundering. To this end, Block is required to establish a BSA/AML compliance program, including procedures for customer due diligence and the reporting of suspicious activity.

65.     FinCEN sets baseline requirements for KYC, a set of regulations and procedures to verify and authenticate a customer's identity to ensure that they are not laundering money, committing fraud, or financing terrorism through a financial institution. Customer Due Diligence

---

[9] *See* Block, Inc. Q1 2020 Earnings Call Transcript (May 6, 2020), https://www.fool.com/earnings/call-transcripts/2020/05/06/square-inc-sq-q1-2020-earnings-call-transcript.aspx.

("**CDD**") is a major part of meeting KYC standards whereby a company assesses and evaluates a customer's risk level after collecting information used to verify the individual's identity.

66.    The need for due diligence does not stop, however, when a customer is "onboarded". Ongoing monitoring or Ongoing Customer Due Diligence ("**OCDD**") is necessary to ensure continued compliance and detect suspicious activity. If any questionable or abnormal behavior is uncovered throughout the KYC procedure, the BSA requires the financial institution to report the suspicious activity (*i.e.*, money laundering, tax evasion, etc.,) to FinCEN no later than 30 calendar days after the date of initial detection constituting the basis for filing a suspicious activity report ("**SAR**").

67.    Block's SEC filings stated that it maintained "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that it operated an AML program designed to prevent money laundering/terrorist financing and to ensure compliance with OFAC sanctions lists.[10]

68.    ███████ ███████ ███████ ██ ████ ████████ ███████ ███████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████

69.    The principal regulations that apply to Cash App and related Block businesses include:

- BSA/AML (FinCEN): Requires a risk-based AML program, Customer Identification/KYC, ongoing monitoring, and SAR filings to FinCEN.

- U.S. Sanctions (OFAC): Screening against OFAC lists and effective controls to detect/stop prohibited transactions.

- Consumer Protection—EFTA/Regulation E and CFPA (CFPB): Duties to reasonably investigate and resolve unauthorized electronic fund transfers, avoid unfair acts or practices, and provide appropriate refunds/credits where warranted.

---

[10] *See* Block, Inc., Annual Report (Form 10-K) (Feb. 26, 2020), at 21, 31.

- State money-transmitter/virtual-currency regimes (*e.g.*, NYDFS): State supervision and examinations of BSA/AML, KYC, transaction-monitoring, and SAR practices (including New York), with authority to require remediation and impose penalties.

70. The Company's recordkeeping and reporting obligations include, among other things:

- Customer-due-diligence/KYC records: Block is expected to maintain records sufficient to evidence identity verification at onboarding and on a continuing basis, to prevent duplicate, impersonated, or synthetic-ID accounts from evading controls.

- Transaction-monitoring and case-management records: A risk-based AML program requires monitoring alerts to be generated, worked, escalated, and resolved on a timely basis, with documentation adequate to support decisions—something the pleadings allege was not happening given large alert and review backlogs.

- Suspicious Activity Reports to FinCEN: When activity meets BSA thresholds, Block must file SARs and retain supporting documentation; the complaints allege under-filing and altering of SAR narratives to downplay severity.

- Sanctions screening and (when appropriate) disclosures to OFAC: OFAC compliance entails screening, interdiction, and maintaining records of hits/decisions; the Class Action Complaint alleges an internal "Missed Block" log documenting hundreds of sanctions control failures that were not properly disclosed.

- Consumer error-resolution files (EFTA/Reg E) and related CFPA compliance documentation: For reports of unauthorized transfers, Block must conduct reasonable investigations and document determinations and remedies; the CFPB's findings cited in the Class Action Complaint focus on the inadequacy of those investigations and denials/refund practices.

71. As detailed herein, throughout the Relevant Period, Block failed to satisfy these recordkeeping and reporting requirements.

3.      **Maintaining Effective Compliance Measures Is a "Mission Critical" Function for Block**

72.      As set forth above and as the Company acknowledges in its Annual Report on Form 10-K for the fiscal year ended December 31, 2020 ("**2020 10-K**"), filed with the SEC on February 23, 2021, Block faces legal, regulatory and compliance risks, including extensive regulation relating to banking and payment services.[11] With respect to these legal, regulatory and compliance risks, the 2020 10-K discloses the following:

> We are subject to a wide variety of local, state, federal, and international laws, regulations, licensing schemes, and industry standards in the United States and in other countries in which we operate. These laws, regulations, and standards govern numerous areas that are important to our business, and include, or may in the future include, those relating to or placing restrictions upon banking, lending, deposit-taking, cross-border and domestic money transmission, foreign exchange, payments services (such as payment processing and settlement services), cryptocurrency, trading in shares and fractional shares, consumer protection, anti-money laundering, escheatment, international sanctions regimes, data privacy and security, and compliance with the Payment Card Industry Data Security Standard, a set of requirements designed to ensure that all companies that process, store, or transmit payment card information maintain a secure environment to protect cardholder data.[12]

73.      The 2020 10-K further provides:

> [A]ny perceived or actual breach of compliance by us with respect to applicable laws, rules, and regulations could have a significant impact on our reputation as a trusted brand and could cause us to lose existing customers, prevent us from obtaining new customers, require us to expend significant funds to remedy the problems caused by breached and to avert further breaches, and expose us to legal risk and potential liability.[13]

74.      Accordingly, maintaining effective compliance is a "mission critical" function for Block, essential to preventing fraud, money laundering, and other illicit activities.

---

[11] *See* 2020 10-K at 38.

[12] *Id.*

[13] *Id.*

75.    The potential for regulatory and reputational harm was especially acute for Cash App, however, as Block publicly touted its low-cost, "frictionless" method for opening new accounts while collecting minimal information about its users.

**B.    Duties of the Board of Directors and the Audit and Risk Committee**

**1.    Duties of the Board of Directors**

76.    According to each of the Company's Proxy Statements filed with the SEC between the years 2018 and 2024 (the "**Proxy Statements**"), Block's Board of Directors "maintains ultimate responsibility for the [Company's] oversight of risk."[14] The Proxy Statements also provide that the Board "recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization.[15]

77.    In addition, each of the Proxy Statements contains the same or substantially similar disclosure set forth in the 2024 Proxy Statement:

> As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus areas for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.[16]

78.    The Proxy Statements establish the following as the "Primary Areas of Risk Oversight" attributed to the full Board:

> Strategic, financial and execution risks and exposures associated with our business strategy, policy matters, succession planning, data

---

[14] *See e.g.*, Block, Inc., Proxy Statement (Schedule 14A) (Apr. 26, 2024), at 10.

[15] *See e.g.*, *id.*

[16] *Id.*

privacy, data security, and cybersecurity, significant litigation and regulatory exposures and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures and our operational infrastructure.[17]

79.    In addition to the duties outlined in the Proxy Statements, the Board is duty-bound to ensure the Company complies with applicable laws and regulations governing money laundering and other financial crimes. The BSA requires financial institutions to maintain an AML program and FinCEN has issued regulations specifying the requirements of such programs.

80.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

## 2.    Duties of the Audit and Risk Committee

81.    The ARC's duties include reviewing compliance programs, assessing risks related to AML and sanctions, and evaluating the effectiveness of internal controls.

82.    Block's Proxy Statements establish the following as the "Primary Areas of Risk Oversight" attributed to the Audit and Risk Committee:

Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, and operational

---
[17] *Id.* at 11.

security and reliability. In addition, our audit and risk committee assists our board of directors with oversight of certain matters related to privacy, data security and cybersecurity.[18]

83.    The ARC's responsibilities are set forth in Audit and Risk Committee Charter (the "**ARC Charter**"), which mandates that the ARC must assist the Board in overseeing the following:

- The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements;

- The qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor");

- The performance of the Company's Independent Auditor and internal audit function; • The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements); and

- Risk assessment and risk management pertaining to the financial, accounting and tax matters as well as data privacy and cybersecurity needs of the Company.[19]

84.    With respect to "Legal and Regulatory Compliance," the ARC Charter states the ARC shall:

- Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "Code");
- Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs,

---

[18] 2024 Proxy at 11.

[19] *See* Charter of the Audit and Risk Committee of the Board of Directors of Block, Inc. (effective as of Nov.18, 2015; as last amended on Oct. 24, 2024), https://s29.q4cdn.com/628966176/files/doc_governance/2024/10/Block-Inc-Audit-and-Risk-Committee-Charter-Oct-2024.pdf.

including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

- Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and • Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting or tax matters of the Company.

85.    With respect to "Risks," the ARC Charter sets forth the following responsibilities:

The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the Company's major financial and other risk exposures, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, the Company's programs, policies relating to legal and regulatory compliance, and operational security and reliability, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. The Audit and Risk Committee will also review the Company's risk management framework, programs, and policies, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

86.    The ARC Charter further provides that:

The Audit and Risk Committee shall report regularly to the Board with respect to the Audit and Risk Committee's activities, including any significant issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements or the performance and independence of the Independent Auditor, as applicable.

87.    With respect to the foregoing, Block's ARC was charged with overseeing the Company's compliance programs, AML and sanctions risks, internal controls, and major risk exposures. The ARC Charter required members to monitor the adequacy of compliance measures,

respond to reports of violations, review regulatory correspondence, and regularly update the Board on significant compliance and risk issues. These duties made the ARC a critical safeguard against legal and regulatory failures. By ignoring red flags and failing to ensure that Block maintained effective compliance and risk-management systems, the ARC abdicated its oversight responsibilities and allowed the Company to operate with materially deficient controls.

88.    Given Block's fintech business model—involving sensitive financial transactions, user data handling, and vulnerability to fraud, money laundering, and sanctions evasion—this oversight roles are mission-critical. Failure to diligently enforce compliance and risk management can expose the Company to regulatory scrutiny, as evidenced by the $295 million in penalties imposed in 2025, underscoring the Board's imperative to proactively mitigate such risks.

## C.    Defendants Repeatedly Made False Assurances to Shareholders Concerning the Company's Comprehensive Compliance Measures

89.    Defendants made numerous false and misleading statements throughout the Relevant Period intended to assure shareholders of the Company's comprehensive compliance measures during the period of Cash App's exponential growth, as set forth in the Company's SEC filings and other public disclosures.

90.    Block's Form 10-Ks are signed by the Officer Defendants and each member of the Board. Block's Form 10-Qs are signed by the Officer Defendants. Additionally, the ARC reviews each of the Company's financial statements.

91.    On February 26, 2020, Block filed its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2019 ("**2019 10-K**"), which represented that that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and which also stated that the Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts."[20] The 2019 10-K further represented that the Company had implemented an effective anti-

---

[20] *See* 2019 10-K at 21, 31.

money laundering program designed to prevent money laundering, terrorist financing, and other illicit activity, stating as follows:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.[21]

92.    On May 6, August 5 and November 5, 2020, Block filed its quarterly reports on Form 10-Q with the SEC for the first, second and third fiscal quarters of 2020, respectively, which were signed by the Officer Defendants, and which stated that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts."[22]

93.    On January 4, 2021, Dorsey signed a public comment letter opposing FinCEN's proposed regulations to strengthen KYC and due diligence requirements for cryptocurrency transactions. He argued that stricter rules were unnecessary because private sector solutions—such as those offered by Block—were already "extraordinarily effective" at mitigating risk,[23] and that

---

[21] *Id.*

[22] *See* Form 10-Q for the quarterly period ended Mar. 31, 2020, filed with the SEC May 6, 2020, at 61, 71; Form 10-Q for the quarterly period ended June 30, 2020, filed with the SEC Aug. 5, 2020, at 64, 74; and Form 10-Q for the quarterly period ended Sept. 30, 2020, filed with the SEC Nov. 5, 2021, at 67, 75.

[23] *See* Square, Inc.'s Federal Comment Letter Regarding FinCEN's Proposed Rulemaking on Requirements for Certain Transactions Involving Convertible Virtual Currency of Digital Assets (Jan. 4, 2021), https://investors.block.xyz/investor-news/news-details/2021/Square-Incs-Federal-

individuals should be able to "participate in financial systems easily and equitably." The letter falsely asserted that Block had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective," rendering the proposed regulations "unnecessary." It further contended that the rules would actually increase the risk of illicit activity, whereas "flexible, risk-based regulation" and private sector tools like blockchain analysis were better suited to detect unlawful conduct. According to Dorsey, Block's efforts and cooperation with regulators had "prove[n] extraordinarily effective in identifying and stopping illicit activities."

94.    On February 23, 2021, Block filed its 2020 10-K, signed by Dorsey and Ahuja, reiterating the same assurances made in the prior year's filing regarding the Company's compliance program, customer vetting and monitoring, and the implementation of an effective AML framework.[24]

95.    On May 6, August 2, and November 4, 2021, Block filed its Form 10-Qs for the first, second, and third quarters of 2021, each signed by Dorsey and Ahuja. In these filings, the Company represented that it maintained "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that it "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [its] risk management efforts."[25]

96.    On February 24, 2022, Block held a conference call during which Dorsey claimed that the Company was focused on preventing fraud on Cash App, stating, in part:

> Well, I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud. We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.

---

Comment-Letter-Regarding-FinCENs-Proposed-Rulemaking-on-Requirements-for-Certain-Transactions-Involving-Convertible-Virtual-Currency-or-Digital-Assets/default.aspx

[24] *See* 2020 10-K at 14, 29, 38.

[25] See Form 10-Q for the quarterly period ended Mar. 31, 2021, filed with the SEC May 6, 2021, at 73, 82; Form 10-Q for the quarterly period ended June 30, 2021, filed with the SEC Aug. 2, 2021, at 78, 88; and Form 10-Q for the quarterly period ended Sept. 30, 2021, filed with the SEC Nov. 4, 2021, at 80, 90.

> So we have limits in place to manage all these things, and a big
> goal for us is to make sure that we're looking for opportunities to
> increase those and to, at the same time, maintain all of the risk
> controls and fraud and continue to do what we've done so well
> over the years. And not just on the Cash App side, but on the
> Square side, keep it in our business forever.[26]

97.     Also on February 24, 2022, Block filed its Annual Report on Form 10-K with the

SEC for the fiscal year ended December 31, 2021 ("**2021 10-K**"), which was signed by Dorsey

and Ahuja, and which contained the same assurances found in the 2019 and 2020 10-Ks about

Block's compliance program, vetting and monitoring customers and implementing an effective

AML program.[27]

98.     On May 5, August 4, and November 3, 2022, Block filed its quarterly report on

Form 10-Q with the SEC for the first, second and third fiscal quarters of 2022, respectively, which

were signed by Dorsey and Ahuja, and which stated that the Company has "a compliance program

focused on the laws, rules, and regulations applicable to [its] business," and that Block "vet[s] and

monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's]

risk management efforts."[28]

99.     These statements were false and misleading because, for years, Defendants failed

to remedy known compliance deficiencies and failed to maintain an effective system of compliance

and risk management to ensure adherence to governing laws and regulations. The Company

repeatedly loosened its risk tolerances to fuel Cash App's growth, onboarding users without proper

identity verification and enabling widespread fraud and criminal activity on the platform—

---

[26] *See* Block's Q4 2021 Earnings Call Transcript (Feb. 24, 2022) (emphasis added),
https://seekingalpha.com/article/4490263-block-inc-s-sq-ceo-jack-dorsey-on-q4-2021-results-
earnings-call-transcript.

[27] *See* 2021 10-K at 15, 30, 41.

[28] *See* Form 10-Q for the quarterly period ended Mar. 31, 2022, filed with the SEC May 5, 2022,
at 82, 93; Form 10-Q for the quarterly period ended June 30, 2022, filed with the SEC Aug. 4,
2022, at 85, 96; and Form 10-Q for the quarterly period ended Sept. 30, 2022, filed with the SEC
Nov. 3, 2022, at 87, 98.

1  including insurance fraud, scams, account takeovers, money laundering, illegal gambling, drug

2  trafficking, sex trafficking, and organized crime.

3  **D.    Block was a Rogue Corporate Actor Overseen by a Complicit Board**

4  100.    Block violated federal and state laws, including the BSA's anti-money laundering

5  requirements, KYC obligations, and consumer protection statutes under the purview of the CFPB.

6  101.    The Company's Cash App platform, through its minimal verification process

7  requiring only a phone number or email and a ZIP code, enabled anonymous accounts that

8  facilitated illicit activities such as money laundering, drug trafficking, and sex trafficking, in direct

9  contravention of record-keeping and reporting mandates for financial institutions.

10  102.    The Board was aware, as demonstrated by escalating SARs during the Relevant

11  Period and internal reports linking blacklisted accounts to dozens or hundreds of other suspicious

12  ones, yet took no remedial action.

13  103.    Over several years, red flags were reported to officers and directors, including

14  Dorsey and Ahuja. These included outsourced compliance functions that caused backlogs and a

15  CFPB investigation that was not reported to the Board for over 18 months. This indicates that the

16  directors were willfully ignorant or deliberately prioritized growth over compliance. Despite this

17  awareness, the Board failed to halt the misconduct, refusing to implement robust compliance

18  systems and instead relying on insufficient machine learning tools, which allowed 40% to 75% of

19  Cash App accounts to be fraudulent or duplicative.

20  104.    This abdication persisted post the March 2023 *Hindenburg Report*, which exposed

21  compliance failures, and amid whistleblower disclosures to FinCEN regarding vulnerabilities to

22  terrorist financing, further entrenching breaches of fiduciary duties.

23  105.    Consequently, Block functioned as a rogue entity, enabling criminal enterprises

24  through features like Bitcoin trading and anonymous Cash Card withdrawals, which bypassed

25  traditional oversight and supported activities such as fraud, human trafficking, and even prisoner

26  contraband transaction.

27

1.     **The Block Board Received Reports in 2019 Evidencing Compliance Deficiencies and that the Company's Platform was Facilitating Illicit Conduct**

106.     

107.

108.

109.

1
2
3
4

110.

5
6
7
8
9
10
11

111.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



1    112.    

2

3

4

5

6

7

8

9

10    113.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1

2

3

114.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   115.

21

22

23

24

25

26

27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    116.

17

18

19

20        2.    **Block's 2020 Public Statements were Inconsistent with Information**

21            **Delivered to the Board in 2019**

22    117.

23

24

25

26

27

118.    On February 26, 2020, the Company filed its Annual Report on Form 10-K for Fiscal Year 2019, which was signed by Dorsey and Ahuja. The 10-K stated the following concerning adherence to compliance requirements and protocols:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

119.    The statements in the Form 10-K, however, were false and misleading to the extent they described an implemented AML program with policies, procedures, internal controls, and a designated compliance officer to prevent money laundering, terrorist financing, and illicit activity. It omitted facts about Cash App's fundamentally flawed compliance infrastructure, which was under-resourced and reliant on inadequate systems that failed to effectively vet customers or monitor transactions.

120.    ███████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████

121.    On May 6, 2020, the Company filed its Quarterly Report on Form 10-Q for Q1 2020, which was signed by Dorsey and Ahuja. The 10-Q stated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of

[the Company's] risk management efforts." (*See* Q1 2020 Form 10-Q at 61, 71). Form 10-Q statements on a compliance program focused on applicable laws and the vetting/monitoring of customers and transactions was materially misleading for the same reasons, including that it omitted ongoing deficiencies, including unaddressed SAR backlogs and fraud increases reported to the ARC in April and July 2019, which undermined the claimed risk management efforts.

122.    On August 5, 2020, the Company issued its Quarterly Report on Form 10-Q for Q2 2020, signed by Dorsey and Ahuja, that stated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts." (*See* Q2 2020 Form 10-Q at 64, 74). The 10-Q's statements were false and misleading, and because it failed to disclose persistent backlogs and compliance gaps reported to the ARC in July 2019.

123.    Also, on August 5, 2020, the Company held an earnings call for Q2 2020, during which Amrita Ahuja stated, "[f]irst, as you noted, customer acquisition, which remains a top priority for Cash App, and we continued to rapidly expand our network here. In June, we had over 30 million monthly active[s], which is up approximately 25% just in the past six months, and this was followed in July by our highest month of net new actives added."

124.    Ahuja also stated, "[Cash App's] strong network effects, which leads to efficient acquisition. These network effects obviously come from the peer-to-peer aspect of the service, where Cash App can acquire new customers for a fraction of the cost of other banks or a financial services company, and that's really enabled us to scale this network of active customers rapidly and efficiently now at 30 million monthly active and growing."

125.    During the call, Dorsey stated, "we do believe Cash App has reached a mainstream scale, and that's with over 30 million monthly active customers in June. And these are monthly active customers, not overall accounts."

126.    The foregoing statements by Dorsey and Ahuja were false and misleading because they failed to disclose that ARC pre-read materials from October 2019 noted risk suspensions reducing active customers.

127.    On October 11, 2020, in response to a *New York Times* article entitled "Fast Fraud," a Block spokesperson stated that the Company was "aware that there has been a recent rise in scammers trying to take advantage of customers using financial products, including Cash App. We've taken a number of proactive steps and made it our top priority." Again, this statement was false because October 2019 ARC reports revealed SAR review delays due to staffing shortages and backlogs exceeding the capacity to conduct investigations.

128.    On November 5, 2020, the Company issued its Quarterly Report on Form 10-Q for Q3 2020, signed by Dorsey and Ahuja. The statement indicated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block ""vet[s] and monitor[s] [its] customers and the payments transactions [it] process[es] for them as part of [the Company's] risk management efforts." This statement was false because it omitted escalating issues, including the October 2019 admissions of the Company's inability to keep pace with SARs.

129.    On November 18, 2020, in response to a *CNBC* article on app-based financial fraud, a Cash App Spokesperson stated, "[p]reventing fraud is critically important to Cash App. We continue to invest in and bolster fraud-fighting resources by both increasing staffing and adopting new technology. We are constantly improving systems and controls to help prevent, detect, and report bad activity on the platform." This statement was false because "preventing fraud was [not] critically important because fraud prevention was not prioritized, and staffing was insufficient, as evidenced by 2019 backlogs.

3.     **The Block Board Received Reports in 2020 Evidencing Compliance Deficiencies and that its Platform was Facilitating Illicit Conduct**

130. ███████████████████████████████████████

████████████████████████████████████████████

████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████

131. ████████████████████████████████████████

████████████

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

16     132.

17

18
19
20

21

22     133.

23

24
25
26
27





134.

135.



136.

137. 

138.

139.

140.

1

2

3

4

5

6

7

8



9

10    141.

11

12

13

14

15

16

17

18

19

20

21

22

23

24    142.

25

26

27

143.

**4.     Block's 2021 Public Statements Were Inconsistent with Information Delivered to the Board in 2020**

144.     On February 23, 2021, the Company filed its Annual Report on Form 10-K for Fiscal Year 2020, which was signed by Dorsey and Ahuja. The report stated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and

1    Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part

2    of [the Company's] risk management efforts." [29]

3        145.    On May 6, 2021, the Company filed its Quarterly Report on Form 10-Q for Q1

4    2021, which stated the Company has "a compliance program focused on the laws, rules, and

5    regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the

6    transactions [it] process[es] for them as part of [the Company's] risk management efforts."[30]

7        146.    On April 23, 2021, in response to KATV report on Cash App Scams, a Block

8    Spokesperson stated "Preventing fraud is critically important to Cash App. We continue to invest

9    in and bolster fraud-fighting resources by both increasing staffing and adopting new technology.

10   We are constantly improving systems and controls to help prevent, detect, and report bad activity

11   on the platform."

12       147.    On August 2, 2021, the Company filed a Quarterly Report on Form 10-Q for Q2

13   2021, that stated the Compliance has "a compliance program focused on the laws, rules, and

14   regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the

15   transactions [it] process[es] for them as part of [the Company's] risk management efforts."

16       148.    On August 15, 2021, in response to an *NBC News* investigation on COVID Benefits

17   Theft, a Cash App Spokesperson stated that Cash App "enhanced our systems to monitor and act

18   upon deposits that we deem to be risky, despite coming from largely trusted sources like state

19   unemployment agencies. We also partner with law enforcement and government agencies to

20   investigate potential fraud and work collaboratively to return those funds when possible."

21       149.    On November 4, 2021, the Company filed its Quarterly Report on Form 10-Q for

22   Q3 2021, stating the Company has "a compliance program focused on the laws, rules, and

23   regulations applicable to [its] business, and Block "vet[s] and monitor[s] [its] customers and the

24   transactions [it] process[es] for them as part of [the Company's] risk management efforts."[31]

---

[29] *See* 2020 Form 10-K at 14, 29, 38.

[30] *See* Q1 2021 Form 10-Q at 73, 82.

[31] *See* Q3 2021 Form 10-Q at 80, 90.

150.    The forgoing statements issued during 2021 were false and misleading primarily because they omitted material facts regarding persistent and escalating deficiencies in compliance practices, thereby creating a misleading impression of effective risk management systems that supported accurate user metrics and customer vetting.

151.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████.[32]

152.    However, the Company's public disclosures, including the Annual Report on Form 10-K for Fiscal Year 2020 filed on February 23, 2021, and subsequent quarterly reports, repeatedly falsely asserted the existence of a robust compliance program focused on applicable laws, with effective vetting and monitoring of customers and transactions. This omission misled investors about the Company's ability to manage risks associated with money laundering, fraud, and illicit activities. Furthermore, statements emphasizing user growth and engagement, including reports of over 36 million transacting active customers as of December 2020 with more than 50% year-over-year growth, 40 million monthly transacting actives in June 2021, and related network effects driving low acquisition costs, overstated the user base by including duplicate and fraudulent accounts attributable to these inadequate controls, as evidenced by internal data indicating fewer unique users. Similarly, responses to media inquiries in 2021, such as those to KATV, NBC News,

---

[32] *See* ████████████████████

1   and others, falsely portrayed proactive and improving fraud prevention measures without

2   disclosing the underlying capacity and backlog issues.

3       153.    Accordingly, the Board was aware and possessed sufficient information to

4   recognize that internal controls were deficient, permitting widespread fraudulent accounts and

5   compliance failures, whereas the Company's public filings and media statements inaccurately

6   proclaimed a robust compliance framework, exaggerated user growth metrics, and proactive fraud

7   mitigation efforts.

8           **5.    The Block Board Received Reports in 2021 Evidencing Compliance**

9                   **Deficiencies and that its Platform was Facilitating Illicit Conduct**

10      154.

1    155. ████████████████████████████████████
2  ██████████████████████████████████████████████
3  ██████████████████████████████████████████████
4  ███████



17 ███████████████

18    156. ████████████████████████████████████
19 ███████████████████████████████████.[33]
20    157. ████████████████████████████████████
21 ███████████████████████████████

[33] *See* ██████████████████████

[redacted]

158. [redacted]

159. [redacted]

160. [redacted]

1
2
3
4
5
6
7
8
9    161.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26    162.
27





163.

164.

165.

### 6.      Block's 2022 Public Statements were Inconsistent with Information Delivered to the Board in 2021

166.     On February 24, 2022, the Company filed its Annual Report on Form 10-K for Fiscal Year 2021, which included stated that the "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts." Also repeated the AML program description from prior 10-Ks.

*See* Form 10-K at 15, 30, 41.

167.     On May 5, 2022, the Company filed its Quarterly Report on Form 10-Q for Q1 2022 that stated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts."

*See* Q1 2022 Form 10-Q at 82, 93.

168.     On August 4, 2022, the Company filed its Quarterly Report on Form 10-Q for Q2 2022 that, again, reassured that the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts."

*See* Q2 2022 Form 10-Q at 85, 96.

169.     On August 24, 2022, a Cash App Spokesperson responded to a *Vice Article* entitled "Hackers Emptying Cash App Accounts" by falsely stating that "[p]reventing fraud is critically important to Cash App. We continue to invest in and bolster fraud-fighting resources by both increasing staffing and adopting new technology. We are constantly improving systems and controls to help prevent, detect, and report bad activity on the platform[.] . . . For those who believe they have fallen victim to an identity-theft or account take-over scams, we encourage them to reach out to Cash App Support where we will review the account in question. If deemed fraudulent, we will take the necessary action starting with account closure and disablement of all applicable products."

170.    On November 3, 2022, the Company issues its Quarterly Report on Form 10-Q for Q3 2022, that stated the Company has "a compliance program focused on the laws, rules, and regulations applicable to [its] business, and Block "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts." *See* Q3 2022 Form 10-Q at 87, 98.

171.    The statements in Block's 2022 filings and public responses were false and misleading when evaluated against the internal information presented to ARC and the full Board in 2021, as documented in the board minutes and reports discussed above. These internal disclosures reveal persistent and escalating deficiencies in the Company's compliance, risk management, and anti-money laundering programs, including inadequate monitoring of customers and transactions, backlogs in addressing suspicious activities, and vulnerabilities that facilitated illegal activities such as gambling and fraud. These issues directly contradict the representations of an effective, focused compliance framework that actively vets and monitors operations.

172.    For example, the February 24, 2022, Form 10-K for Fiscal Year 2021 asserting that the Company maintains "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that it "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts." It also repeats prior AML program descriptions. This statement, however, is false and misleading because the 2021 board reports demonstrate that the Company's compliance and risk management efforts were demonstrably ineffective and overwhelmed throughout the year, undermining claims of focused vetting and monitoring. For instance, the February 10, 2021, ARC meeting noted a material increase in SARs to 34,751 for Q4 2020, indicating failures in transaction monitoring.

173.    By April 27, 2021, the ARC was informed of a substantial backlog in the Unacceptable Use Program Team related to gambling alerts, with the platform being exploited for illegal gambling operations—evidence of inadequate customer vetting and transaction oversight. Further, the July 28, 2021, report highlighted escalating fraud requiring a complete, increases in fake accounts and account takeovers during COVID, and an explosion in SARs to 67,041 in Q2

2021, with admissions that product controls were vulnerable. The October 26, 2021, update showed SARs only declined after outsourcing to clear a backlog, not due to internal improvements. These ongoing issues, including an NY DFS inquiry (purpose redacted but implying regulatory scrutiny), reveal systemic vulnerabilities that contradict the portrayal of a robust, proactive compliance program.

174.    Statements in the May 5, 2022, Form 10-Q for Q1 2022 touting compliance were false. The April 27, 2021, report explicitly noted the need to outsource suspicious activity investigations due to increasing SARs and backlogs, suggesting internal resources for vetting and monitoring were insufficient. The July 28, 2021, presentation further detailed compliance challenges, including heightened fake accounts, ATOs, and fraud escalation, with management conceding vulnerable product controls and a spike in SARs. Additionally, the October 26 and 27, 2021, updates to the ARC and full Board addressed a surge in gambling cases leading to "denylistings" in June and July 2021, underscoring failures in real-time transaction monitoring and customer oversight. These documented deficiencies persisted into late 2021, rendering the 2022 assurance of effective risk management inaccurate and potentially concealing the extent of unresolved issues from investors.

175.    Statement from the August 4, 2022, Form 10-Q for Q2 2022 were false and misleading in view of the 2021 Board information, which evidences a compliance framework plagued by inefficiencies and vulnerabilities that belied any claims of focused vetting and monitoring. The July 28, 2021, ARC report demonstrated the need for a major overhaul in fraud management amid rising fake accounts, ATOs, and SARs reaching 67,041 in Q2 2021—levels that management attributed to weak product controls.

176.    Earlier, the April 27, 2021, disclosure of UUP backlogs for gambling-related alerts and platform misuse for illegal operations further illustrates lapses in transaction processing and customer monitoring. The October 2021 reports to the ARC and full Board noted temporary SAR reductions only after backlog clearance by an external vendor and spikes in deny listings due to gambling, indicating reactive rather than proactive measures. Collectively, these internal

acknowledgments of escalating compliance failures contradict the 2022 portrayal of a diligent, rule-focused program.

177.    Statements from the November 3, 2022, Form 10-Q for Q3 2022 were false and misleading when they emphasized compliance programs focused on the laws, rules, and regulations applicable. 2021 internal information to the ARC and Board consistently documents compliance and risk management shortcomings that undermine the depicted focus on legal adherence and monitoring. Key examples include the April 27, 2021, report on UUP backlogs for gambling alerts and the platform's role in illegal operations, coupled with the need to outsource investigations amid rising SARs. The July 28, 2021, disclosure of fraud escalation, fake account increases, ATOs, and vulnerable controls, with SARs at 67,041 in Q2, illustrates failures in customer vetting and transaction processing. The October 2021 reports to the ARC and full Board further noted gambling-related spikes in deny listings and SAR reductions only post-backlog clearance, alongside an NY DFS inquiry signaling potential regulatory concerns. These persistent issues indicate that the compliance program was not effectively implemented, making the 2022 reassurance misleading by omitting or downplaying the extent of these vulnerabilities.

### 7.    The Block Board Received Reports in 2022 Evidencing Compliance Deficiencies and that its Platform was Facilitating Illicit Conduct

178.    ████████████████████████████████████
████████████████████████

179.    ████████████████████████████████████████
████████████████████████████████████████
████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

1    180. 

2

3

4

5

6

7

8

9

10

11

12

13    181.

14

15

16

17

18

19

20

21

22

23

24

25

26

27



182.

34

183.



184. ███████████████████████████████████████[35]

185. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████[36]████████████████████.

[35]

[36] ███████

186.

1

2

### 8.    Block's 2023 Public Statements were Inconsistent with Information Delivered to the Board in 2022

3

4    187.    On February 23, 2023, the Company filed its Annual Report on Form 10-K for

5    Fiscal Year 2022 , which reiterated that the Company has "a compliance program focused on the

6    laws, rules, and regulations applicable to [its] business," and Block "vet[s] and monitor[s] [its]

7    customers and the transactions [it] process[es] for them as part of [the Company's] risk

management efforts."[37]

8    188.    On March 30, 2023, the Company responded to the Hindenburg Report and stated

9    that its "approach to compliance is consistent with other financial services platforms," and that

10    "the company's compliance investments have grown more than twice as fast as overall gross profit,

11    and compliance investments have also meaningfully increased as a percentage of our overall

12    operating expenses." The response also disclosed that "44 million of its 51 million monthly

13    transacting accounts were associated with verified identities," and that those accounts were in turn

14    associated with 39 million unique SSNs.

15    189.    During a May 4, 2023, Earnings Call for Q1 2023, Jack Dorsey stated:

16    We also want to make sure that we continue to build trust. And as I
17    talked about before, trust is earned in many ways. It's through
transparency, through reliability, dependability, and that is all
18    something that we earn. We're not given, and that comes over time.
And a lot of that has to be focused on how our customers ultimately
19    trust us, our partners, including our banking partners and the
regulatory—regulators trust us as well. So this is a significant focus
20    for us and always has been. It has to be, as you do anything in the
financial space and certainly always been part of our mindset and
21    our approach and turn it over to Amrita to talk about benchmarking
against peers and more broadly investment.
22

23    190.    During the same call, Amrita Ahuja said:

24    In order to do that, we must maintain a culture of compliance and
responsible risk management, including through investment in
25    programs, processes, controls and teams with deep compliance
expertise, prioritizing compliance ultimately helps us drive trust to
26    their customers with regulators and external partners, and that
enables us to then develop innovative products responsibly. We have
27

---

[37] *See* Form 10-K at 20, 38, 50.

significantly grown our investment in compliance over the last few years. At a company level, we expect to invest approximately $160 million in compliance in 2023, which represents an increase in our investment dollars of more than 5x since 2020, outpacing OpEx growth by approximately 2x during that same period. Specifically, within Cash App, the pace of growth on compliance investment has been even faster than that. With regards to how you might benchmark that, other companies may calculate compliance investment differently. So it can be hard to benchmark across companies. What we include in these figures is investments that go towards personnel as well as software and tooling amongst other areas to support our program. These dedicated compliance resources support our business units and our customers that our business units serve and ultimately provide oversight across the ecosystem.

191.     Defendants' statements in the 2023 filings, public response, and earnings call were false and misleading when assessed against the internal information presented to the ARC and the full Board in 2022, as documented in the board minutes and reports. These internal disclosures reveal ongoing and intensifying deficiencies in the Company's compliance, risk management, and anti-money laundering efforts, including escalating suspicious activity reports, inaccurate reporting, improper handling of incidents, and systemic vulnerabilities that enabled illicit activities. These revelations directly undermine the representations of a robust, focused compliance program, effective investments, and trust-building measures.

192.     For example, statements in the February 23, 2023, Form 10-K for Fiscal Year 2022 reiterated that the Company maintains "a compliance program focused on the laws, rules, and regulations applicable to [its] business," and that it "vet[s] and monitor[s] [its] customers and the transactions [it] process[es] for them as part of [the Company's] risk management efforts."

193.     This representation, however, was false and misleading because the 2022 Board reports demonstrate that the Company's compliance and risk management framework were both ineffective and overwhelmed, contradicting assertions of focused vetting, monitoring, and adherence to applicable laws. For example, the February 8, 2022, ARC presentation detailed increasing compliance issues, including the formation of a Special Investigations Unit within the Financial Crimes teams due to the prevalence and sophistication of illegality on the platform. It further noted that "Financial Crime Risk" was trending upward, with the platform being exploited

by prison inmates for illicit activities, and that prior SAR reports for Q2 and Q3 2021 were inaccurate, necessitating massive upward revisions. The April 19, 2022, ARC report indicated continued SAR increases and improper closure of incidents before review, while the July 27, 2022, update reported SARs at 77,660 (down from 91,693 in Q1 2022) but attributed the decline to reduced alert volumes (with redacted details), stating that despite lower numbers, certain aspects (redacted for privilege) rendered the figures misleading.

194.    By October 19, 2022, SARs had risen to 94,806 in Q3, underscoring unresolved vulnerabilities in customer vetting and transaction monitoring. These documented failures, including updates to the full Board on February 9 and April 20, 2022, reveal systemic shortcomings that belie the 2023 portrayal of a diligent, rule-oriented program.

195.    Statement from the March 30, 2023, Response to the Hindenburg Report were false and misleading. The response asserted that the Company's "approach to compliance is consistent with other financial services platforms," that "the company's compliance investments have grown more than twice as fast as overall gross profit, and compliance investments have also meaningfully increased as a percentage of our overall operating expenses." It also discloses that "44 million of its 51 million monthly transacting accounts were associated with verified identities," and that those accounts were linked to 39 million unique Social Security Numbers (SSNs).

196.    This statement is false and misleading considering the 2022 internal disclosures, which indicate that the Company's compliance system was marked by significant deficiencies and ineffectiveness, rendering claims of consistency with peers, effective investment growth, and robust verification processes inaccurate. The February 8, 2022, ARC report highlighted the need for an SIU due to increasingly prevalent and sophisticated illegality, upward-trending financial crime risks (including use by prison inmates), and inaccurate prior SAR reporting requiring substantial revisions—issues that suggest inadequate investments and controls relative to the scale of problems.

197.    The April 19, 2022, update noted rising SARs and improper incident closures, implying failures in verification and monitoring that could undermine the reported 44 million

1    verified accounts. Furthermore, the July 27, 2022, report described misleadingly reduced SAR

2    figures (77,660 versus 91,693 in Q1) due to reduced alerts (redacted explanation), with redacted

3    details indicating persistent concerns despite any investments. The October 19, 2022, SAR

4    increase to 94,806 in Q3 further evidences that compliance efforts were not yielding proportional

5    improvements, potentially overstating the efficacy of investments and verification in comparison

6    to industry standards.

7         198.    ████████████████████████████████████████████████

8    █████████████████████████████████████████████████████████████████

9    █████████████████████████████████████████████████████████████████

10   █████████████████████████████████████████████████████████████████

11   █████████████████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████████████

15   ██████████

16        9.     **The Block Board Received Reports in 2023 Evidencing Compliance**

17               **Deficiencies and that its Platform was Facilitating Illicit Conduct**

18        199.    ████████████████████████████████████████████████

19   ███████████████████████████████████

20   █████████████████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████████

22   █████████████████████████████████████████████████████████████████

23   █████████████████████████████████████████████████████████████████

24   █████████████████████████████████████████████████████████████████

25   █████████████████████████████████████████████████████████████████

26   █████████████████████████████████████████████████████████████████

27   █████████████████████████████████████████████████████████████████



200.

201.

1
2
3
4
5
6
7
8
9

10

11    202.

12

13

14

15

16

17

18

19

20

21

22    203.

23    [38]

24    204.

25

26

27

[38]

1

2

3

4  [redacted]<sup>39</sup>

5    205.  [redacted]

6

7

8

9

10

11

12

13

14

15

16

17

**E.**    **Board-Level Red Flags Showing Cash App Compliance Violations and Oversight Lapses – A Mission-Critical Failure**

206.    Block's Board was responsible for ensuring compliance with mission-critical laws governing Cash App, including the Bank Secrecy Act, Anti-Money Laundering requirements, Know Your Customer protocols, Office of Foreign Assets Control sanctions, the Electronic Funds Transfer Act (EFTA), and the Consumer Financial Protection Act. These regulations directly underpin Cash App as the Company's core product and its license to operate. Yet internal reports, audits, employee escalations, and regulatory interactions repeatedly placed the Board on notice of

<sup>39</sup> *Id.*

1    noncompliance, and it failed to act with diligence, prioritizing growth over remediation through

2    persistent backlogs, ineffective outsourcing, and ignored warnings.

3         207.   ████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ██████████████

9         208.   ████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ███████████████████████████████████████████

14        209.   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████

20        210.   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████

25        211.   ████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ███████████████

3      212.    ███████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████████████████████

9      213.    ███████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████████████████

12     214.    Escalating regulatory red flags, which the ARC Charter required for Board

13 engagement, were similarly ignored. This included the CFPB's path from December 2023 notice

14 of potential action to July 2024 enforcement authority, culminating in a January 16, 2025, consent

15 order finding unfair practices, deception, and EFTA/Reg E violations tied to inadequate

16 investigations of unauthorized transfers. Parallel actions included a multistate $80 million

17 BSA/AML penalty on January 15, 2025, mandating remediation like a compliance committee and

18 independent consultant, and a NYDFS $40 million settlement on April 10, 2025, for critical gaps

19 in customer due diligence, risk-based controls, transaction monitoring, and SAR processes.

20     215.    ███████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ██████████████

24     216.    ███████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27

1 ███████████████████████████████████████████████████████████████

2 ████████████████████████████████████

3     217.    External red flags no reasonable director could dismiss were ignored: the March

4 23, 2023, Hindenburg report and February 16, 2024, NBC coverage of FinCEN whistleblowers

5 alleging ineffective KYC and a "Wild West" approach, events demanding ARC/Board discussion

6 and remediation per the Charter.

7     218.    ██████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████

15 ████████████████

16     219.    ██████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████

20 ████████████████████████████

21     220.    The red flags were not vague but clear indicators of systemic failure: surging SAR-

22 eligible activity without adequate filings; regulator and third-party reviews identifying material

23 weaknesses; and practices tying consumer harm to deficient controls fueling AML/sanctions risks.

24 Taken together, the regulatory actions, quantified metrics, sanctions logs, and consumer-protection

25 findings establish that the Board failed to implement and monitor a compliance system for mission-

26 critical obligations and consciously ignored a cascade of Caremark-type red flag, which supports

27 a strong inference of bad-faith oversight failure and director liability.

VI.     **INSIDER TRADING CLAIMS**

A.     **The Company's Two Co-Founding Directors, Dorsey and McKelvey, Collectively Sold Over $1 Billion of Block Stock at Artificially Inflated Prices While in Possession of Material Non-Public Information**

221.     As described herein, Block had a 639% stock increase in the 18 months following the initial COVID-19 shutdown and subsequent pandemic. As also described herein, this growth was fueled by a lessening of risk controls and compliance measures.

222.     As directors of Block, Defendants Dorsey and McKelvey (the "**Insider Trading Defendants**") were privy to material, non-public information about the true state of Block's business and operations.

223.     The Insider Trading Defendants used their knowledge of Block's material, non-public information to sell their personal holdings while they knew the Company's stock was artificially inflated during the Relevant Period. Together, the Insider Trading Defendants collectively sold over $1 billion of stock when the Company's stock was artificially inflated as a result of the Company's deficient compliance measures.

224.     Specifically, from November 16, 2020, through and inclusive of May 17, 2021, Defendant Dorsey sold 2,712,148 shares of Block Class A Common stock for a total profit of $621,065,064, as illustrated in the below chart:

| Date | # of Class A Shares Sold | Avg. Trading Price | Total Amount |
|---|---|---|---|
| November 16, 2020 | 100,000 shares | $175.95 | $17,595,375 |
| November 23, 2020 | 100,000 shares | $202.74 | $20,273,924 |
| November 30, 2020 | 100,000 shares | $209.14 | $20,914,482 |
| December 7, 2020 | 100,000 shares | $206.69 | $20,969,001 |
| December 14, 2020 | 100,000 shares | $216.87 | $21,687,104 |
| December 21, 2020 | 100,000 shares | $238.86 | $23,885,834 |

| December 28, 2020 | 100,000 shares | $227.43 | $22,742,962 |
|---|---|---|---|
| January 4, 2021 | 100,000 shares | $219.53 | $21,952,825 |
| January 11, 2021 | 100,000 shares | $229.87 | $22,987,316 |
| January 19, 2021 | 100,000 shares | $227.88 | $22,787,786 |
| January 25 2021 | 100,000 shares | $222.81 | $22,281,355 |
| January 25, 2021 | 100,000 shares | $215.97 | $21,596,701 |
| February 1, 2021 | 12,148 shares | $217.91 | $2,647,171 |
| February 8, 2021 | 100,000 shares | $249.61 | $24,960,566 |
| February 16, 2021 | 100,000 shares | $277.59 | $27,759,279 |
| February 22, 2021 | 100,000 shares | $271.30 | $27,130,427 |
| March 1, 2021 | 100,000 shares | $235.27 | $23,526,964 |
| March 8, 2021 | 100,000 shares | $215.22 | $21,522,386 |
| March 15, 2021 | 100,000 shares | $242.07 | $24,207,166 |
| March 22, 2021 | 100,000 shares | $224.29 | $22,428,655 |
| March 29, 2021 | 100,000 shares | $210.26 | $21,025,910 |
| April 5, 2021 | 100,000 shares | $230.13 | $23,012,880 |
| April 12, 2021 | 100,000 shares | $259.25 | $25,924,783 |
| April 19, 2021 | 100,000 shares | $250.07 | $25,006,842 |
| April 26, 2021 | 100,000 shares | $249.33 | $24,932,781 |
| May 3, 2021 | 100,000 shares | $245.60 | $24,559,654 |
| May 10, 2021 | 100,000 shares | $225.47 | $22,546,921 |
| May 17, 2021 | 100,000 shares | $201.98 | $20,198,014 |
| **TOTAL** | **2,712,148 shares** | **$228.54** | **$621,065,064** |

225.    Defendant McKelvey likewise materially benefited by selling his personal holdings with knowledge that the Company's stock was artificially inflated. Specifically, from August 18, 2020, through and inclusive of August 17, 2021, McKelvey sold 2,600,000 shares of Block Class A Common stock for a total profit of $564,330,020, as illustrated in the below chart.

| Date | # of Class A Shares Sold | Avg. Trading Price | Total Amount |
|---|---|---|---|
| August 18, 2020 | 200,000 | $149.79 | $29,957,007 |
| September 15, 2020 | 200,000 | $153.93 | $30,786,196 |
| October 13, 2020 | 200,000 | $189.80 | $37,959,868 |
| November 16, 2020 | 200,000 | $177.03 | $35,405,324 |
| December 14, 2020 | 200,000 | $217.36 | $43,472,216 |
| January 19, 2021 | 200,000 | $225.72 | $45,144,255 |
| February 16, 2021 | 200,000 | $277.45 | $55,489,771 |
| March 16, 2021 | 200,000 | $247.70 | $49,539,664 |
| April 19, 2021 | 200,000 | $246.17 | $49,233,305 |
| May 18, 2021 | 200,000 | $205.56 | $41,111,883 |
| June 15, 2021 | 200,000 | $227.98 | $45,595,709 |
| July 12, 2021 | 200,000 | $242.98 | $48,595,130 |
| August 17, 2021 | 200,000 | $260.20 | $52,039,692 |
| **TOTAL** | **2,600,000** | **$217.05** | **$564,330,020** |

226.    The stock sales executed Dorsey and McKelvey exhibit a pattern of suspicious timing that closely aligns with the issuance of materially false or misleading statements regarding the Company's compliance practices and user metrics. These sales occurred during periods when defendants possessed material non-public information about systemic compliance failures in Cash App, including inadequate AML, KYC, and sanctions screening protocols. For instance, the sales often followed shortly after public disclosures that overstated Cash App's user base and touted robust compliance measures, thereby artificially inflating the stock price and enabling profitable disposals before corrective revelations exposed the underlying risks.

227.    Specific instances underscore this opportunistic alignment. In August 2020, following the release of Block's Q2 2020 Form 10-Q and Shareholder Letter—which misleadingly emphasized compliance vetting and reported 30 million monthly active users despite known deficiencies—McKelvey sold 200,000 shares for approximately $30 million. Similarly, in November 2020, after the Q3 2020 filings that overstated user engagement amid an undisclosed CFPB investigation, Dorsey sold 300,000 shares for about $58 million, while McKelvey sold another 200,000 shares for $35 million. These transactions deviated from historical patterns and occurred during escalating internal red flags, such as SAR surges and compliance backlogs.

228.    The persistence of this pattern into 2021 reinforces the suspicious nature of the sales. For example, Dorsey's Q1 2021 disposals of approximately 1.2 million shares for $250 million followed his January 4, 2021, public comment letter to FinCEN, which falsely claimed effective compliance while omitting known vendor inefficiencies and fraud complaints. McKelvey's concurrent sales of 200,000 shares in January for $45 million aligned with quarterly ARC updates on unremediated risks. Collectively, these trades, totaling over $1 billion for Dorsey and McKelvey not only breached fiduciary duties but also perpetuated harm to the company by capitalizing on inflated valuations sustained by misleading assurances, ultimately contributing to regulatory penalties and stock declines upon disclosure.

## VII.    DEFENDANTS SOLICITED SHAREHOLDER APPROVAL FOR ELECTIONS AND COMPENSATION THROUGH MATERIALLY MISLEADING PROXY STATEMENTS

229.    The Individual Defendants caused Block to file annual Proxy Statements with the SEC on Form DEF 14A on or about April 28, 2022 (the "**2022 Proxy Statement**"), April 28, 2023 (the "**2023 Proxy Statement**"), and April 26, 2024 (the "2024 Proxy Statement," and collectively, the "**Proxy Statements**"). The Proxy Statements were issued "[b]y order of the Board of Directors" and signed by Dorsey. At the time that Dorsey signed the Proxy Statements, each of the Current Director Defendants served on the Board.

230.    Each of the Proxy Statements was intended to, and did, procure Block's shareholders' votes with respect to matters materially affecting the Company that legally required shareholder approval. All three Proxy Statements sought and obtained election of the Current Director Defendants by shareholder vote, in each case upon the Board's explicit recommendation as to which directors should be elected.

231.    Each of the Proxy Statements was materially false in that it failed to disclose that the Company for a period of years failed to correct identified compliance deficiencies, including the failure to maintain an effective compliance and risk management system to adhere to governing laws and regulations. Each of the Proxy Statements was materially false in that it failed to disclose

that the Company continuously loosened its risk tolerances in order to accelerate Cash App growth, including the onboarding of Cash App users without requisite identity verification, and further including the proliferation of fraud and other criminal activity facilitated by the Cash App platform, including insurance fraud, scams and account takeovers, money laundering, gambling, drug dealing, sex trafficking, and organized crime.

232.    The foregoing facts were known to the Director Defendants and only discovered by Plaintiff through the exercise of his inspection rights to obtain internal Company books and records. The foregoing facts rendered the following statements made regarding the Company's risk management in each of the Proxy Statements materially false.

Risk Management

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. *Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus area for review. These areas include strategic, operational, people, financial and compliance. We address risks*

*such as cybersecurity, financial reporting and competition within each of these areas.*

While our board of directors maintains ultimate responsibility for the oversight of risk*, it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below.* Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

233.    These statements were materially false and misleading in that they failed to disclose that: (i) the Board's oversight of enterprise risk assessment, including its implementation of risk tolerances, limits, and mitigation, allowed an illegal business plan premised on falsely inflated Block user metrics; (ii) the Board's oversight of enterprise risk assessment, including its implementation of risk tolerances, limits, and mitigation, allowed for the proliferation of fraud and other criminal activity to be facilitated by the Cash App platform; and (iii) the Board either did not obtain the "full understanding of the applicable risk[s]," under their responsibility, or turned a blind eye and failed to correct identified compliance deficiencies

234.    The Proxy Statements then went on to describe the primary areas of risk oversight for each of the Board and its subcommittees as follows:

| Board of Directors / Committee | Primary Area of Risk Oversight |
|---|---|
| Full Board of Directors | Strategic, financial and execution risks and exposures associated with our business strategy, policy matters, succession planning, data privacy, data security, and cybersecurity, significant litigation and regulatory exposures and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures and our operational infrastructure. |
| Audit and Risk Committee | Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.[2] |
| Nominating and Corporate Governance Committee | Risks and exposures associated with director and executive succession planning; director and corporate officer conflicts of interest, other than transactions with related persons reviewed by our audit and risk committee; environmental, social, corporate governance, inclusion and diversity, and corporate responsibility matters; and overall board and committee effectiveness and composition.[2] |
| Compensation Committee | Risks and exposures associated with leadership assessment, retention and succession, executive compensation programs and arrangements and our compensation philosophy and practices. |

235.    The materially false Proxy Statements caused direct harm to the Company in that, among other things, Defendants' omissions perpetuated systemic legal violations within the Company, bringing severe fines, penalties, and other harm to which the Company was ultimately subjected, as well as through the creation of compensation obligations by the Company that would not have existed but for the materially false and incomplete Proxy Statements.

236.    As a result of the false and misleading 2022 Proxy Statement and the Director Defendants' reelection to the Board in 2022, the Director Defendants entered compensation contracts with the Company and afforded themselves a generous compensation program via a shareholder vote on the false and misleading 2022 Proxy Statement. Such compensation included, inter alia, $250,000.00 in restricted stock units for each non-employee director, an additional $70,000.00 in restricted stock units for Botha as Lead Independent Director, an additional $40,000.00 as an annual cash retainer, and the additional following cash fees for service on each of the committees of the Board of Directors:

| Board Committee | Chair Fee | Member Fee |
|---|---|---|
| Audit and Risk Committee | $20,000 | $10,000 |
| Compensation Committee | $15,000 | $5,000 |
| Nominating and Corporate Governance Committee | $10,000 | $2,500 |
| Capital Compliance and Governance Committee | $15,000 | $5,000 |

237.    In total, the Company really awarded 2022 compensation for each of the Director Defendants in the following amounts:

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Roelof Botha | — | 375,524 | — | 375,524 |
| Amy Brooks | — | 292,784 | — | 292,784 |
| Shawn Carter | — | 290,152 | — | 290,152 |
| Paul Deighton | 50,934 | 249,944 | — | 300,878 |
| Randy Garutti | 50,000 | 249,944 | — | 299,944 |
| James McKelvey | — | 290,152 | — | 290,152 |
| Mary Meeker | — | 305,576 | — | 305,576 |
| Anna Patterson | — | 35,595 | — | 35,595 |
| Sharon Rothstein | 28,906 | 333,223 | — | 362,129 |
| Lawrence Summers | 50,000 | 249,944 | — | 299,944 |
| David Viniar | — | 44,468 | — | 44,468 |
| Darren Walker | — | 292,784 | — | 292,784 |

238.    As a result of the false and misleading 2023 Proxy Statement, and the subsequent reelection of the Director Defendants to the Board, the Director Defendants secured compensation contracts with the Company and approved for themselves a lucrative compensation package based on a tainted shareholder vote. This package included, among other things, $250,000 in restricted stock units for each non-employee director, an additional $70,000 in restricted stock units for Botha as Lead Independent Director, a $40,000 annual cash retainer, and further cash fees for service on the Board's committees:

| Board Committee | Chair Fee | Member Fee |
|---|---|---|
| Audit and Risk Committee | $20,000 | $10,000 |
| Compensation Committee | $15,000 | $5,000 |
| Nominating and Corporate Governance Committee | $10,000 | $2,500 |

239.    In total, the Company really awarded 2023 compensation for each of the Director Defendants in the following amounts:

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Roelof Botha | — | 374,618 | — | 374,618 |
| Amy Brooks | — | 292,220 | — | 292,220 |
| Shawn Carter | — | 289,720 | — | 289,720 |
| Paul Deighton | 65,000 | 249,959 | — | 314,959 |
| Randall Garutti | 50,000 | 249,959 | — | 299,959 |
| James McKelvey | — | 289,720 | — | 289,720 |
| Mary Meeker | — | 304,642 | — | 304,642 |
| Neha Narula | — | 236,125 | — | 236,125 |
| Sharon Rothstein | 45,000 | 249,959 | — | 294,959 |
| Lawrence Summers | 50,000 | 249,959 | — | 299,959 |
| Darren Walker | — | 290,243 | — | 290,243 |

240.    As a result of the false and misleading 2024 Proxy Statement and their subsequent reelection to the Board, the Director Defendants secured compensation contracts with the Company and approved for themselves an excessive compensation package based on a tainted shareholder vote. This package provided, among other things, $250,000 in restricted stock units

for each non-employee director, an additional $70,000 in restricted stock units for Botha as Lead Independent Director, a $40,000 annual cash retainer, and further cash fees tied to service on the Board's committees:

| Board Committee | Chair Fee ($) | Member Fee ($) |
|---|---|---|
| Audit and Risk Committee | 20,000 | 10,000 |
| Compensation Committee | 15,000 | 5,000 |
| Nominating and Corporate Governance Committee | 10,000 | 2,500 |

241.    In total, the Company really awarded 2024 compensation for each of the Director Defendants in the following amounts:

| Director | Fees Earned or Paid in Cash ($) | Stock Awards ($)[XXXXX] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Roelof Botha | — | 372,928 | — | 372,928 |
| Amy Brooks | — | 290,917 | — | 290,917 |
| Shawn Carter | — | 288,535 | — | 288,535 |
| Paul Deighton | 65,000 | 249,952 | — | 314,952 |
| Randall Garutti | 52,170[4] | 249,952 | — | 302,122 |
| James McKelvey | 10,000 | 278,776 | — | 288,776 |
| Mary Meeker | — | 302,981 | — | 302,981 |
| Neha Narula | — | 297,576 | — | 297,576 |
| Sharon Rothstein | 32,266 | — | — | 32,266 |
| Larry Summers | 17,995 | — | — | 17,995 |

242.    Each of the Director Defendants was obligated, under their fiduciary duties imposed by Delaware law and the disclosure requirements of the federal securities laws, to fully and fairly disclose all material information necessary for shareholders to make informed voting decisions in connection with the election of Board members in 2022, 2023, and 2024.

243.    Despite their fiduciary duties and obligations under state and federal law, the Director Defendants caused Block to file and disseminate materially false and misleading Proxy Statements. These Proxy Statements misrepresented the Company's compliance and oversight framework, the responsibilities of the Board and its committees, and the basis on which directors sought reelection. Defendants uniformly failed to disclose material information concerning the Board's duty to ensure compliance with banking and consumer protection laws, as well as the Board's failure to fulfill that duty. The Proxy Statements also concealed that the Company's financial and operating metrics were materially distorted by widespread criminal activity on Cash

App, including users creating multiple accounts to facilitate fraud and other illegal conduct—misconduct the Board was obligated, but failed, to prevent.

244.    The Proxy Statements were materially false and misleading because Defendants failed to disclose, among other things:

(a) that the Company's reported financial performance was inflated by guidance that ignored Block's practice of allowing customers—including those previously blacklisted—to create multiple Cash App accounts;

(b) that the Director Defendants failed in their oversight duties to ensure functioning internal controls, enterprise risk management, and legal and regulatory compliance, as evidenced by persistent compliance backlogs, the Company's inability to detect and prevent fraud and other crimes on the platform, and inadequate customer service;

(c) that the Director Defendants, in carrying out their responsibilities under Board committee charters, repeatedly chose to relax onboarding requirements to boost user growth, thereby facilitating the creation of fraudulent accounts and inflating customer metrics; and

(d) that the Board was repeatedly informed of Cash App's use to facilitate unlawful conduct—including insurance fraud, account takeovers, money laundering, gambling, drug trafficking, sex trafficking, organized crime, and other criminal activity—yet failed to take corrective action.

245.    Considering the Defendants' material omissions from the Proxy Statements, the elections of directors to the Board were secured through false and misleading disclosures. Had shareholders been provided complete and accurate information regarding the Board's performance of its oversight duties—including its role in permitting the Company's extensive facilitation of criminal activity—the directors would not have been reelected.

246.    The election of the Director Defendants caused substantial harm to the Company. By relying on directors who shirked their oversight responsibilities, Block was left defenseless against ongoing misconduct carried out through its platform. The resulting regulatory penalties,

customer liabilities, and reputational damage were a direct consequence of the Board's failure to act—failures that were concealed by the materially false Proxy Statements. But for the Board's abdication of its duties, this harm would not have occurred.

247.    Accordingly, Block has suffered damages as a result of the materially false and misleading Proxy Statements that secured the reelection of the Director Defendants, perpetuated their misconduct, and induced shareholder approval of director compensation packages. Shareholders would have rejected these proposals had the true facts been disclosed.

## VIII.    REJECTNG THE DEMAND WAS DONE IN BAD FAITH GIVEN THE AMPLE EVIDENCE IN THE 220 PRODUCTION DEMONSTRATING THAT THE DIRECTOR DEFENDANTS BREACHED NUMEROUS FIDUCIARY OVERSIGHT DUTIES

248.    The rejection of the Demand by Block's Board was done in bad faith under Delaware law because it reflected a conscious disregard for their fiduciary obligations rather than a legitimate exercise of business judgment. The conduct detailed in the Demand and the allegations herein—encompassing systematic failures by defendants Jack Dorsey, Amrita Ahuja, Roelof Botha, Amy Brooks, Shawn Carter, Paul Deighton, Randy Garutti, James McKelvey, Mary Meeker, Anna Patterson, Sharon Rothstein, Lawrence Summers, and David Viniar to oversee compliance with anti-money laundering, know-your-customer, sanctions, and consumer protection regulations—constitutes breaches of the duties of loyalty and oversight committed in bad faith. These defendants persistently ignored repeated red flags, including ballooning Suspicious Activity Reports (with Cash App responsible for over 80% of filings), declining KYC completion rates below 50%, high fraud losses and unresolved customer complaints, material weaknesses in compliance programs identified through audits, outsourcing inefficiencies resulting in alert backlogs exceeding 169,000 by 2020, inflated user metrics driven by 40-75% fake or duplicate accounts, suppression of internal dissent leading to mass resignations among compliance staff, and anomalies in pandemic loan processing at rates eight times the industry average.

249.    By prioritizing growth over remediation, delaying escalation of regulatory investigations (such as remaining unaware of the CFPB probe for over 1.5 years), issuing materially false assurances of robust compliance in SEC filings and proxy statements from 2020 to 2024, and disregarding public disclosures from the *Hindenburg Report* and NBC News whistleblower accounts depicting a "Wild West" compliance environment, the Defendants exposed the Company to $295 million in regulatory penalties, consent orders requiring extensive remediation, and ongoing securities class action litigation. Given that a majority of the Board faces substantial liability for these actions and lacks independence due to personal, professional, and financial entanglements (including insider trading by Dorsey and McKelvey), their self-interested refusal to pursue the claims in the Demand—effectively shielding themselves from accountability—demonstrates bad faith, as it cannot be reconciled with a good-faith effort to protect shareholder interests.

A.    **Specific Allegations Against Jack Dorsey That the Board Failed to Consider in "Deferring/Rejecting the Demand**

250.    As co-founder, CEO, and Chairman, Jack Dorsey breached his fiduciary duties of care, loyalty, and good faith through a conscious disregard of his affirmative compliance obligations. His prioritization of aggressive growth over regulatory adherence exposed the Company to severe legal and financial harm.

251.    Dorsey was directly involved in promoting Cash App's "frictionless" onboarding, which systematically undermined compliance with key regulations, including the Bank Secrecy Act, KYC, and consumer protection laws. This approach facilitated the proliferation of duplicate and fraudulent accounts, enabling illicit activities like money laundering and sanctions evasion.

252.    Despite receiving quarterly reports detailing a surge in suspicious activity reports with Cash App accounting for over 80% of filings—Dorsey failed to address the root causes. His inaction persisted even after attending all-hands meetings in 2021 where compliance staff highlighted rampant fraud and leadership inertia. He also failed to ensure adequate resourcing for

1  compliance functions, ignoring headcount shortfalls and outsourcing deficiencies that led to a
2  massive backlog of unresolved alerts.

3      253.    As a signatory to the Company's SEC, Dorsey issued materially false and
4  misleading statements, assuring investors of comprehensive compliance programs while
5  knowingly concealing audit-identified material weaknesses.



24      255.      Dorsey further breached his fiduciary duties by under-resourcing
25  compliance functions:

26
27

a. ████████████████████████████████████
████████████████████████████████████
█████████████████

b. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████

c. ████████████████████████████████████
███ █ ████ ████ ███ ██████ █████ ██████
█████████████

256.    Moreover, Dorsey breached his fiduciary duties by issuing false and misleading statements in SEC filings. For example, there were serious discrepancies between public filings and internal knowledge:

a. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██

b. ████████████████████████████████████
████████████████████████████████████
██ ██ ████ ██ ██ ████ ███ ███ ███
████████████████████████████████████
██████████████████

c. ████████████████████████████████████
███ ███ ██ ████ ████ ██ ███ ███ █ ███ ███ ███
███████████████

d. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

257.  Dorsey further breached his fiduciary duties by promoting "Frictionless Onboarding" and the proliferation of illicit accounts thereby prioritizing growth over compliance:

a. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

b. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

c. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

258.  The books and records produced by the Company ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

259.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

260.    The Board's rejection of the Demand as against Botha was executed in bad faith,

261.    The Board's rejection of the Demand against Brooks was executed in bad faith,

262.    The Board's rejection of the Demand made against Carter was executed in bad faith,

263.   The Board's rejection of the Demand as against Deighton was executed in bad faith,

264.   The Board's rejection of the Demand as against Garutti was executed in bad faith,

265.   The Board's rejection of the Demand as against McKelvey was executed in bad faith,

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████

5      266.    The Board's rejection of the Demand as against Meeker was executed in bad faith,

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ██████████████████████████████████

11     267.    The Board's rejection of the Demand as against Patterson was executed in bad faith,

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████ ███ ██ █ ████████ ██ ██████ █

17 ██████████████

18     268.    The Board's rejection of the Demand as against Rothstein was executed in bad faith,

19 ████████████████████████████████████████████████

20 █ ███ ███ ████ ██ ███ ████ ████ ██

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ███████████████████████████████████████

24     269.    The Board's rejection of the Demand as against Summers was executed in bad faith,

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

1 ██████ ████ ████ ████ ████ ██ ██████ ██████ ████ ████ ██ █

2 ██████████████████████████████

270.    The Board's rejection of the Demand as against Viniar was executed in bad faith,

4 ████████████████████████████████████████

5 ████████████████████████████████████████

6 ████████████████████████████████████████

7 ██████████████████████████████████

## IX.    DAMAGES TO BLOCK

271.    As a result of the foregoing breaches of fiduciary duty, Block has incurred significant expenses, and will continue to expend significant sums, including:

(a) the $295 million in damages already incurred by the Company because of fines from regulatory activity taken by the CFPB, NYDFS and state regulators;

(b) the costs incurred to carry out internal investigations, including the costs of legal and other fees paid to outside counsel, auditors, and other experts;

(c) the costs incurred to rectify the Company's corporate governance failures, including any mandatory compliance measures instituted by the CFPB, state regulators and other agencies;

(d) losses incurred as a result of the Defendants Dorsey and McKelvey's misuse of proprietary and material non-public information;

(e) loss in market value and stockholder equity;

(f) damage to Block's reputation and goodwill; and

(g) legal fees, costs, and amounts payable in settlement or satisfaction of lawsuits brought against the Company related to the foregoing wrongdoing, including but not limited to Securities Class Action.

272.    Block has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties of loyalty to the

Company. Plaintiff, as a shareholder and representative of Block, seeks damages and other relief for the Company.

X.     **CLAIMS FOR RELIEF**

<u>**COUNT I**</u>

*For Violations of the Section 14(a) of the Exchange Act and Rule 14a-9*

(Against Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker)

273.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

274.    Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker caused Block to issue the Proxy Statements to solicit shareholder votes for the election of directors.

275.    These Proxy Statements contained materially false and incomplete disclosures, including by affirmatively touting the Company's risk management and Board-level oversight, while failing to disclose:

(a)    the extent to which the Company's financial performance depended upon the Company's artificially inflated guidance which failed to take into account that the Company allowed its customers, including those who had been supposedly blacklisted from the Company's systems, to continue to open multiple accounts on Cash App;

(b)    the extent to which the Director Defendants failed in their duties to oversee and ensure that the Company had functioning internal controls, enterprise risk management, and legal and regulatory compliance, including the Company's ongoing failure to detect and prevent fraud and other crimes from occurring on the platform, the Company's constantly bourgeoning compliance backlogs, and the failure to provide adequate levels of customer service;

(c)    the nature of the Director Defendants' performance of their duties under the charters of the Board's subcommittees, including the reason for the Director Defendants' decision to allow the Company to repeatedly relax its onboarding requirements in allowing customers to make multiple Square App accounts in order to favor growth through the illicit procurement of false customer accounts; and

(d)    the numerous instances in which the Board was informed that Cash App was used to facilitate unlawful conduct, including insurance fraud, fraudulent account takeovers, and other fraud; money laundering; gambling; drug dealing; sex trafficking; organized crime; and other illicit conduct.

276.    The false statements and omissions in each of the Proxy Statements concerned matters of material importance to the Company and were material to shareholders in response to the solicitations embodied in each Proxy Statement. The Proxy Statements were an essential link in Defendants' conscious disregard for Block's known facilitation of unlawful conduct and disclosure of false financial metrics, as disclosure of the truth to shareholders would have brought an end to the shareholders' endorsement of Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker as fiduciaries and termination of the Company's compensation policies.

277.    Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker failed to include these material facts in the Proxy Statements, rendering the Proxy Statements materially false and misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

278.    As a direct and proximate result of the issuance of the materially false and misleading Proxy Statements, Block suffered direct and significant damages in the form of, inter alia, the perpetuation of widespread illicit conduct committed through the Company's banking instruments, substantial fines and penalties inflicted on the Company for this misconduct by regulators and substantial additional liabilities in the form of whistleblower complaints facing the Company.

279.    In connection with the improper acts alleged under this Count, Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications or the facilities of a national securities exchange.

280.    This Count is only alleged against Defendants Dorsey, Deighton, Botha, Brooks, Carter, McKelvey, Garutti, Meeker, Rothstein, Summers, Viniar, and Walker as to those Proxy Statements that were issued during their terms as directors on the Board.

## **COUNT II**

*For Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

(Against the Individual Defendants)

281.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

282.    During the Relevant Period, Defendants caused Block to repurchase millions of shares of the Company common stock at artificially inflated prices.

283.    In October 2023, the Board authorized Block officers to execute Company repurchases of up to $1 billion of the Company's Class A common stock. 336. From November 2023 through April 2024, Defendants caused Block to repurchase 7,316,000 shares of Block common stock for over $506 million.

284.    In connection with Block's repurchases of Block shares, Defendants disseminated or approved false or misleading statements about Block, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

285.    While the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase

millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.

286.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Block in connection with the Bank's purchases of Block stock during the Relevant Period.

287.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Block stock, which were intended to, and did, (a) deceive Block regarding, among other things, its user engagement metrics, the increased risks taken to accelerate growth, the proliferation of fraud on the platform, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Block stock; and (c) cause Block to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the illicit account creation scheme.

288.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

289.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe

1    recklessness. The misstatements and omissions of material facts set forth in this Complaint were

2    either known to Defendants or were so obvious that Defendants should have been aware of them.

3         290.    Throughout the Relevant Period, Defendants also had a duty to disclose new

4    information that came to their attention and rendered their prior statements to the market materially

5    false or misleading.

6         291.    Defendants' false or misleading statements and omissions were made in connection

7    with the purchase or sale of the Company's stock, both by the Company itself and by the Insider

8    Trading Defendants.

9         292.    As a result of Defendants' misconduct, Block has and will suffer damages in that it

10    paid artificially inflated prices for Block common stock purchased as part of the repurchase

11    program and suffered losses when the previously undisclosed facts.

12         293.    As the truth was revealed, the price of Block's stock declined immediately and

13    precipitously as the artificial inflation was removed from the market price of the stock. On May 1,

14    2024, after NBC News reported that federal prosecutors were digging into former employees'

15    allegations of "widespread and yearslong compliance lapses" at the Company, the price of Block

16    Class A common stock fell from $73 per share at market close on April 30, 2024, to $66.84 per

17    share at market close on May 1, 2024 – a decline of over 8% on unusually heavy trading volume

18    of over 22 million shares traded.

19         294.    Block would not have purchased these securities at the prices it paid, or at all, but

20    for the artificial inflation in the Company's stock price caused by Defendants' false or misleading

21    statements.

22         295.    As a direct and proximate result of Defendants' wrongful conduct, the Company

23    suffered damages in connection with its purchases of Block stock during the Relevant Period. By

24    reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the

25    Exchange Act and SEC Rule 10b-5.

26

27

## COUNT III

*For Violations of Section 29(b) of the Exchange Act*

(Against the Individual Defendants)

296.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

297.    As a result of their conduct, as alleged in this Complaint, Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with Block regarding their compensation.

298.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

299.    Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered with Block. Indeed, the violations of Section 14(a) stemming from the use of false and misleading Proxy Statements for shareholder votes are directly tied to each Defendants' employment with and/or compensation received from Block.

300.    Block was and is an innocent party with respect to Defendants' Exchange Act violations.

301.    Plaintiff, on behalf of Block, seeks rescission of the contracts between Defendants and Block due to Defendants' violations of the Exchange Act while performing their job duties.

302.    Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## COUNT IV

*For Breach of Fiduciary Duty*

(Against the Director Defendants)

303.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

304.    By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the

Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Each director of the Company owed to the Company and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, ensuring the Company's business was being conducted lawfully, and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

305.    The Director Defendants, because of their positions of control and authority as directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

306.    The Director Defendants violated and breached their fiduciary duties of candor, good faith and loyalty. More specifically, the Director Defendants violated their duty of good faith by failing to maintain an adequate system of oversight in failing to ensure that the Company maintained effective compliance and risk management systems and adhered to governing laws and regulations.

307.    The Director Defendants were each involved in the alleged wrongdoing or aware of it and failed to act to stop it. To the extent any Director Defendant was unaware of the misconduct set forth therein, such Director Defendant was reckless in disregarding his/her duties to monitor the Company's core operations.

308.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Block has sustained significant and actual damages, as alleged herein.

309.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

310.    Plaintiff, on behalf of Block, has no adequate remedy at law.

## COUNT V

*For Breach of Fiduciary Duty*

(Against the Officer Defendants)

311.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

312.    The Officer Defendants owed and continue to owe fiduciary obligations to Block and its shareholders. By reason of their fiduciary relationships, the Officer Defendants owed and owe Block the highest obligation of good faith, fair dealing, loyalty, and due care.

313.    The Officer Defendants breached those fiduciary duties by knowingly and intentionally implementing lax compliance measures and/or loosening the Company's compliance measures in order to facilitate growth, which allowed fraud and other criminal activity to proliferate on the Cash App platform.

314.    As a direct and proximate result of the Officer Defendants' failure to perform their fiduciary obligations, Block has sustained significant and actual damages, as alleged herein.

315.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

316.    Plaintiff, on behalf of Block, has no adequate remedy at law.

## COUNT VI

*For Breach of Fiduciary Duty for Insider Trading Under* Brophy

(Against the Insider Trading Defendants)

317.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

318.    As directors of the Company at the time they sold shares of Block stock, the Insider Trading Defendants owed Block and its shareholders a fiduciary duty of loyalty and good faith.

319.    At the time of the Insider Trading Defendants' stock sales, the Insider Trading Defendants were in possession of material, adverse, non-public information as alleged herein, and sold Company stock on the basis of such information.

320.    At the time of the Insider Trading Defendants' stock sales, the Insider Trading Defendants possessed information concerning the Company's deficient compliance measures, which allowed fraud and other illegal activity to run rampant on the Company's platform and which served as the predicate for Block's continued growth.

321.    As the use of Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge and impose a constructive trust on any illegal profits obtained thereby.

322.    Plaintiff, on behalf of Block, has no adequate remedy at law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.    An order declaring that Plaintiff may maintain this action on behalf of Block, and that Plaintiff is an adequate representative of the Company;

B.    An order declaring that the Individual Defendants have breached their fiduciary duties to Block;

C.    An order declaring that the Individual Defendants have violated Sections 10(b), 14(a), and 29(b) of the Exchange Act;

D.    An order determining and awarding to Block the damages sustained by it as a result of the violations set forth above by the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

E.    An order imposing a constructive trust upon and ordering disgorgement of all profits made, or all losses avoided, by the Insider Trading Defendants as a result of the fiduciary breaches alleged herein, together with pre-judgment and post-judgment interest thereon;

F.    An order directing Block and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Block and its shareholders from a repeat of the wrongful conduct described herein;

G.    Awarding Plaintiff his costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

H.    Granting such other relief as this Court deems just and appropriate.

## XII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: October 9, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/_____
Adam M. Apton (State Bar No. 316516)
Email: aapton@zlk.com
1160 Battery Street East, Suite 100 - #3425
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (212) 363-7171

Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Correy A. Suk (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com

*Counsel for Plaintiff*

**<u>VERIFICATION</u>**

I, Michael O'Neill, do hereby verify that I am a holder of common stock of Block, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October _____3_____, 2025

*Michael O'Neill*
Michael O'Neill (Oct 3, 2025 16:14:00 EDT)
_____
Michael O'Neill

# EXHIBIT A



<div align="right">

33 Whitehall Street, 17th Floor
New York, New York 10004
T: 212-363-7500
www.zlk.com

</div>

<div align="right">

**Gregory Mark Nespole**
gnespole@zlk.com

</div>

**Via Fedex and Email (ir@block.xyz)**

The Board of Directors
  Attn: Mr. Jack Dorsey, Chairman
Block, Inc.
1955 Broadway, Suite 600
Oakland, CA 94612
c/o
Colin B. Davis
GIBSON DUNN
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive Suite 1200, Irvine, CA 92612-4412
CDavis@gibsondunn.com

  **Re: Confidential Demand for the Board of Block Inc. to Initiate Legal Action
    and Take Necessary and Appropriate Remedial Measures**

Gentlemen:

   This letter is on behalf of Michael O'Neill, a stockholder of Block, Inc. ("Block") or the ("Company") who has continuously held shares of Block's common stock at all relevant times, including during the period from 2019 to Present (the "Relevant Period"). Proof of our client's standing was included with our client's demand for books and records dated April 29, 2025, a courtesy copy is attached herewith.

   This letter constitutes a formal demand, pursuant to Delaware Chancery Court Rule 23.1 and Delaware law, that the Board of Directors investigate and take appropriate action to address serious breaches of fiduciary duty by certain current and former directors and officers of Block as detailed below. The gravamen of this demand is that Block's directors and officers failed to ensure adequate compliance and risk management for its Cash App, enabling widespread fraud and illicit activities due to lax onboarding practices. They issued false statements about compliance, misled shareholders via materially false and misleading proxy statements, and caused Block to repurchase stock at inflated prices. Block's co-founders, Jack Dorsey and James McKelvey, also sold over $1 billion in stock while aware of these issues, further breaching their fiduciary duties. This misconduct led to $295 million in regulatory penalties, reputational harm, a securities class alleging claims against the Company's officers and directors, and other damages to the Company.

LEVI&KORSINSKYLLP

June 25, 2025
Page 2 of 7

    This demand is based on counsel's investigation, including a review of Block's public filings, news reports, regulatory actions, and books and records obtained pursuant to 8 Del. C. § 220.

### The Company

    Block, originally founded as Square, Inc. in February 2009 by co-founders Dorsey and McKelvey, is a financial services and digital payment company focused on providing services to businesses and consumers. Initially launched to offer point-of-sale systems for small and medium-sized businesses through its Square ecosystem, the Company expanded with the introduction of its Cash App in 2013, a platform enabling peer-to-peer payments, investments, and other financial services.

    Headquartered in Oakland, California, with a distributed work model, Block's Class A common stock trades on the NYSE under the symbol "SQ." As a controlled company under Delaware law, Block's governance structure grants significant influence to its co-founders, particularly Dorsey, who serves as Chairman, CEO, and a director. Dorsey and McKelvey, a director, together held approximately 61.32% of the Company's stock voting power in 2021 due to their ownership of Class B common stock with ten votes per share, allowing them to exert substantial control over corporate decisions vastly disproportionate to their economic interest in the Company.

    The Company's current Board of Directors (the "Board") consists of Dorsey, McKelvey, Roelof Botha, Amy Brooks, Shawn Carter, Paul Deighton, Randal Garutti, and Mary Meeker. Former Directors include Anna Patterson, Sharon Rothstein, Lawrence Summers, David Viniar, and Darren Walker.

### Cash App

    Cash App is a mobile payment service developed by Block that was launched in 2013. It allows users to send and receive money instantly via a smartphone app u. Key features include:

- Peer-to-Peer Payments: Users can transfer money instantly to others using a phone number, email, or unique "$Cashtag" identifier.

- Debit Card: The Cash Card, a prepaid Visa debit card linked to a user's Cash App balance, enables spending at merchants and ATM withdrawals.

- Investing: Users can buy and sell stocks and Bitcoin directly within the app.

- Banking Services: Features like direct deposit, savings, and personal loans are available, positioning Cash App as a mobile banking alternative.

- Accessibility: Available to users aged 13 and older, with minimal requirements to sign up (e.g., a phone number or email and a ZIP code).

    Cash App has grown significantly, reporting over 53.1 million monthly active users by 2023, driven by its user-friendly interface and low barriers to entry. It became a critical revenue driver for Block, especially during the COVID-19 pandemic, when it facilitated direct deposit of relief payments.

**LEVI&KORSINSKY**LLP

June 25, 2025
Page 3 of 7

### *Cash App is Prone to Mischief*

Cash App's design and operational practices make it particularly susceptible to fraud, money laundering, and other illicit activities for the following key reasons:

*"Frictionless" Onboarding Process:* Cash App requires only a phone number or email and a ZIP code to create an account, with no mandatory bank account or Social Security number verification. This low barrier, termed "frictionless onboarding," was designed to maximize user growth but sacrifices meaningful identity checks. This lack of Know Your Customer ("KYC") protocols allows bad actors to create accounts anonymously or under false identities, making it easier to engage in fraudulent or criminal activities like money laundering, drug dealing, or sex trafficking.

*Inadequate Compliance and Risk Management*: Block has failed to implement effective compliance systems, relying on insufficient machine learning instead of human oversight or funding for compliance programs. Critical compliance functions were outsourced to third-party vendors, resulting in inefficiencies and backlogs that further weakened oversight. This led to undetected fraud, with 40% to 75% of Cash App accounts reportedly being fake, fraudulent, or duplicative. Even when accounts were flagged for fraud, Block blacklisted or deactivated them without banning the underlying user, allowing bad actors to create new accounts repeatedly. The Board reportedly was aware that blacklisted accounts were often linked to dozens or hundreds of other suspicious accounts but took no corrective action.

*Attractiveness to Illicit Actors:* The app's instant transfer capabilities and minimal verification make it an attractive tool for illegal activities. For example, whistleblowers reportedly reported to the US Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) that Cash App lacked effective procedures to verify customer identities, leaving it vulnerable to money laundering and terrorist financing. This vulnerability is exacerbated by the Cash Card's facilitation of anonymous spending, which can be exploited for illicit purchases or cash withdrawals, bypassing traditional banking oversight. Cash App's support for Bitcoin trading adds another layer of anonymity, as cryptocurrencies are often used in illicit transactions due to their decentralized nature.

### *The Board's and Management's Breaches of Fiduciary Duties*

The current and former members of the Board and responsible members of management failed to oversee critical compliance functions, including by delegating this mission-critical corporate function to third-party vendors and reliance on inadequate machine learning rather than properly funding tried and true, industry standard compliance programs. There is troubling evidence that certain of Block's fiduciaries intentionally abdicated their fiduciary duty of oversight. For example, Dorsey and Amrita Ahuja (CFO/COO) breached their duties of loyalty and good faith by knowingly implementing and loosening compliance measures to prioritize user growth over legal obligations. This deliberate strategy fueled illicit activity on Cash App, directly contributing to Block's regulatory and financial woes.

Their actions ignored known risks, including evidence that fraudulent accounts were linked to dozens or hundreds of other active accounts, demonstrating a willful disregard for Block's interests.

LEVI&KORSINSKYLLP

June 25, 2025
Page 4 of 7

The directors and officers further breached their duty of candor by issuing false and misleading statements about Block's compliance and risk management. For example, Dorsey's February 24, 2022, claim that Block had "limits in place to manage" fraud was knowingly false, given the Board's awareness of pervasive compliance deficiencies. Annual proxy statements misrepresented the Board's oversight, omitting critical failures such as the inability to detect fraud, investigate customer complaints, or provide adequate customer service, misleading shareholders into approving director elections and compensation.

These misrepresentations violated Section 14(a) of the Securities Exchange Act. The concealment of these violations of the US securities laws resulted in the Company's stock trading at an artificially high price. As a result, Block was further damaged by repurchasing approximately $506 million of its stock at artificially inflated prices from November 2023 to April 2024.

There is evidence that the Board and responsible management affirmatively prioritized growth over compliance to garner ever-increasing profits. Block's leadership, including Dorsey and Ahuja, prioritized rapid user acquisition over compliance to boost financial metrics, especially during the COVID-19 pandemic when Cash App became a distribution channel for relief payments. This led to inflated user counts, with the Company shifting to account-based metrics in Q4 2021 despite knowing many users held multiple accounts. There is evidence the Board and responsible management ignored "red flags" that the Company's compliance was inadequate, including the Board's receipt of numerous warnings, including ballooning Suspicious Activity Reports and a CFPB investigation.

There is credible evidence that Dorsey and McKelvey breached their duty of loyalty by selling over $1 billion in Block stock at inflated prices while possessing material non-public information about Cash App's compliance failures and inflated user metrics. These sales, which violated Block's insider trading policy, enriched them at the Company's expense.

*The 220 Production Supports the Demand*

The 220 production demonstrates that



LEVI&KORSINSKYLLP

June 25, 2025
Page 5 of 7



- ███████████████████████████████████████████
- ███████████████████████████████████████████
- ███████████████████████████████████████████
- ███ ██ ██ █ █ █ █ ██ ██ ██
- ███████████████████████████████████████████

Based on the above excerpts

In  summary,

LEVI&KORSINSKYLLP

June 25, 2025
Page 6 of 7

███████████████████████████████████████████

*Resulting Harm to Block*

The directors' and officers' fiduciary breaches directly caused Block to incur $295 million in penalties from the CFPB (January 16, 2025) and NYDFS (April 10, 2025) for violations of consumer protection and financial oversight laws.

Their misconduct triggered a securities class action lawsuit, reputational damage amplified by the March 23, 2023, *Hindenburg Research* report and *NBC News* exposés (February 16 and May 1, 2024), and a material stock price drop on May 1, 2024, eroding shareholder value

Block faces ongoing legal costs, compliance remediation expenses, and diminished market confidence due to these failures.

These breaches of fiduciary duties—marked by a failure to oversee core operations, intentional prioritization of growth over compliance, and self-interested insider trading—demonstrate a profound betrayal of Block's interests. The Board and management must be held accountable for the resulting damages, which include hundreds of millions in penalties, litigation exposure, and irreparable harm to the Company's reputation and financial health.

Cash App's user-friendly design and minimal onboarding requirements, while key to its rapid growth, have made it a magnet for fraudulent and criminal activities. Block's directors and officers knowingly or recklessly failed to address these vulnerabilities, prioritizing user acquisition over compliance, ignoring red flags, and maintaining inadequate oversight. This led to significant regulatory penalties, reputational damage, and ongoing legal challenges, underscoring Cash App's susceptibility to mischief due to its operational and governance shortcomings.

*Demand for Legal Action*

Accordingly, our client demands that a thorough investigation be conducted by a fully empowered and independent special committee, composed of directors free from conflicts of interest, to investigate the allegations outlined above. The committee should engage independent legal counsel and forensic experts to examine:

- The Board's and officers' oversight failures regarding Cash App's compliance and risk management systems.

- The issuance of false and misleading statements in proxy statements, public filings, and other communications.

- The insider stock sales by Dorsey and McKelvey, including whether they traded on material non-public information.

Thereafter, our client demands that the special committee or an agent thereof pursue appropriate remedies, including:

LEVI&KORSINSKYLLP

June 25, 2025
Page 7 of 7

- Initiating litigation against current and former directors and officers for breaches of fiduciary duty and violations of federal securities laws.

- Seeking disgorgement of profits from Dorsey and McKelvey's insider stock sales.

- Pursuing recovery of the $295 million in regulatory penalties and other damages, including legal fees and settlement costs from the securities class action.

Our client further demands that the Company adopt and enforce robust corporate governance and compliance measures to prevent future misconduct, including:

- Strengthening Know Your Customer and anti-fraud protocols for Cash App.

- Enhancing Board oversight of compliance and risk management, including regular reporting by the Audit and Risk Committee.

- Revising executive compensation policies to align with shareholder interests and penalize compliance failures.

Our client further demands the rescission of employment or compensation contracts with directors and officers who violated Sections 10(b) and 14(a) of the Securities Exchange Act.

***Response Requested***

Please provide a written response to this demand within 20 days from the date of receipt, outlining the Board's intended actions to address the allegations and demands set forth herein. If the Board refuses to act or fails to respond adequately, our client reserves the right to pursue derivative litigation on behalf of Block to remedy the harms caused by the defendants' misconduct.

Thank you for your attention to this matter.

Very truly yours,

*Greg M. Nespole*

Gregory Mark Nespole

Encl.

cc:    Brian M. Lutz
       Daniel Tepper
       Correy A. Suk

# EXHIBIT B



**VIA EMAIL**

August 28, 2025

# Gregory Mark Nespole

**Levi & Korsinsky LLP**
3 Whitehall Street, 17th Floor
New York, New York 10004
Email: gnespole@zlk.com

Re:        **Demand on the Board of Directors of Block, Inc.**

Dear Mr. Nespole,

I am writing in further response to your June 25, 2025 stockholder litigation demand letter on behalf of Mr. Michael O'Neill (the "Demand") to the Board of Directors (the "Board") of Block, Inc. ("Block" or the "Company").  The Board considered the Demand on July 31, 2025.

The Demand alleges, among other things, that certain officers and directors of Block failed to ensure adequate compliance and risk management systems, caused the Company to issue false and misleading statements to investors, and engaged in insider trading, all of which are alleged in a putative securities class action currently pending against Block, *Gonsalves v. Block, Inc., et al.*, Case No. 25-cv-00642-NW (N.D. Cal.) (the "Related Securities Action").  The Demand, like the Related Securities Action, also relies on allegations based on (i) statements from SEC filings and shareholder letters regarding Block's compliance and risk management practices, (ii) documents produced to pursuant to a books and records demand made under Section 220 of the Delaware General Corporations Law, and (iii) the March 23, 2023 report issued by Hindenburg Research. Further, the Demand's allegations are the subject of other ongoing governmental inquiries.  The Demand asserts, among other claims, that Block's officers and directors breached their fiduciary duties to Block and harmed the Company by exposing it to liability in the Related Securities Action and by requiring the Company to expend resources in connection with the Related Securities Action.

Because the subject matter of the Demand substantially overlaps with the subject matter of the Related Securities Action (and other ongoing related proceedings), causing Block to take legal action at this time against any of the officers and directors named in the Demand would prejudice Block's defense in those matters (and could also prejudice Block's defense and/or response to the other ongoing related proceedings).  Moreover, the ultimate resolution of the Related Securities Action (as well as the other ongoing related proceedings) will inform the Board about the merits of the Demand's allegations and thus assist the Board's evaluation of the Demand.  And according to the Demand itself, the damage the Company has allegedly suffered depends, at least in part, on the outcome of the Related Securities Action.

In light of these factors, and after careful deliberation, the Board has determined that it would be in the best interests of Block and its shareholders to defer action on the Demand until final resolution of the Related Securities Action and ongoing related proceedings.  To address any

concerns your client may have regarding the running of the statute of limitations of any claim belonging to the Company during the pendency of the Board's deferral of the Demand, have agreed or are already subject to agreements that toll the limitations period for claims raised in the Demand.

The Board will monitor the progress of the Related Securities Action and ongoing related proceedings, and will revisit the Demand following the conclusion of these matters or, if events make it appropriate, sooner.

Very truly yours,

DocuSigned by:

*Chrysty Esperanza*

24ADD0E51DCD4CB...

**Chrysty Esperanza**

**Chief Legal Officer and Secretary of Board of Directors**
Block, Inc.
chrysty@block.xyz